2009 ME 42

**John L. JORGENSEN et al.**

v.

**DEPARTMENT OF TRANSPORTATION.**

Supreme Judicial Court of Maine.

Argued: Jan. 15, 2009.

Decided: April 28, 2009.

G. Steven Rowe, Attorney General, Ronald W. Lupton, Asst. Atty. Gen. (orally), Augusta, James M. Bowie, Esq., Lisa Fitzgibbon Bendetson, Esq., Thompson & Bowie, LLP, Portland, for the Maine Department of Transportation.

Bernard J. Kubetz, Esq. (orally), Mark D. Beaumont, Esq., Eaton Peabody, Bangor, for John L. Jorgensen and Karen S. Jorgensen.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, MEAD, and GORMAN, JJ.

CLIFFORD, J.

[¶ 1] The Department of Transportation appeals from the denial of its summary judgment motion entered in the Superior Court (Sagadahoc County, *Horton, J.*), on the complaint of John L. Jorgensen and Karen S. Jorgensen asserting negligence in connection with a motor vehicle accident that occurred at a road construction site. The Department contends that the court erred in concluding that the Department is not immune from suit based on discretionary function immunity. We affirm the judgment.

## I. BACKGROUND

[¶ 2] The summary judgment record establishes the following facts, which we view in the light most favorable to the Jorgensens, as the nonmoving party. *See Rodriguez v. Town of Moose River*, 2007 ME 68, ¶ 19, 922 A.2d 484, 489.

[¶ 3] On October 30, 2006, the Department was performing an operation to repair and improve the road shoulder in the southbound lane of Route 209, a State highway in Phippsburg. The operation involved laying material onto the shoulder of the road to raise the shoulder to a height even with that of the travel lanes. Route 209 is a two-lane road with a painted divider line running down its center. During the shouldering operation, the southbound lane was closed, and southbound traffic was diverted to the northbound lane through that section of roadway.

[¶ 4] The lead foreman supervising the scene was responsible for the safety of the Department employees and passing motorists. The foreman considered whether blind curves existed in the area and the level of visibility in certain stretches of road in setting up a traffic control plan. He drove through the site and verified where signs would be placed in order to usher traffic safely through the construction zone. He instructed one worker where to set up some of the signs, placed some signs himself, and then reviewed all of the signs to make sure they were located properly. Three signs were set up at each end of the work zone to be viewed by approaching drivers. One sign stated "Road Work Ahead," another sign said "One Lane Road Ahead," and the third sign showed a picture of a flagger.

[¶ 5] The Department also hired flaggers from Suburban Security, Inc. for assistance during the shouldering operation. The foreman stationed one flagger in the northbound lane and one flagger in the southbound lane to direct traffic through the zone. Because the shoulder work was taking place in the southbound lane, the flaggers were to stop and signal traffic heading in each direction to proceed only in the northbound lane through the construction zone. It was the foreman's expectation that a southbound vehicle, once directed to proceed through the zone by the flagger, would immediately cross over into the northbound lane and remain in that northbound lane until the vehicle reached and passed the second flagger, at which time the vehicle would then cross back over into the southbound lane and proceed away from the construction zone.

[¶ 6] The foreman decided against placing barricades or cones in the area because he reasoned that barricades would hinder traffic, and that cones would be knocked over and would force traffic onto the dirt

shoulder, which was not wide enough for vehicles in some places. The foreman expected that the Department trucks parked in the southbound lane would also help to control traffic flow in that a southbound vehicle passing through the construction area in the northbound lane would observe the trucks in the southbound lane and would thereby know to stay in the northbound lane until passing the second flagger.

[¶ 7] The Manual on Uniform Traffic Control Devices for Streets and Highways (MUTCD) is a traffic control manual developed by the Federal Highway Department. The MUTCD, which has been adopted by the Department, provides guidance as to how to control traffic during such shouldering projects. The MUTCD states that the details of a traffic control plan "depend[ ] entirely on the nature and complexity of the situation," and should be "altered, when necessary, to fit the conditions of a particular [traffic control zone]." It requires the consideration of many variables, such as "location of work, highway type, geometrics, vertical and horizontal alignment, intersections, interchanges, road user volumes, road vehicle mix (buses, trucks, and cars), and road user speeds," as well as "road configuration, location of the work, work activity, duration of work, road user volumes, road vehicle mix …, and road user speeds." The MUTCD also states that "[a]pplying these guidelines to actual situations and adjusting to field conditions requires judgment." The parties' statements of material fact do not make clear the extent to which the foreman consulted or otherwise relied on the MUTCD in setting up this particular construction zone.

[¶ 8] At approximately 9:50 a.m. on October 30, Jorgensen was driving south on Route 209. He entered the construction zone at the instruction of the flagger on the north end of the zone, and began to pass through the construction zone heading south in the northbound lane. At that time, several different kinds of construction vehicles were lined up in the southbound lane. In the northbound lane heading south, Jorgensen passed a grader and a dump truck, and then he pulled back into the southbound lane *before* passing the second flagger at the southern end of the construction zone. Jorgensen sustained serious injures when his vehicle collided with the rear of a parked wheeler truck that was in the southbound lane.

[¶ 9] The wheeler truck had its headlights and taillights on at the time of the collision, as well as a strobe light located between the cab and body of the truck, although the strobe light was not visible to vehicles approaching from the rear. The wheeler's rear strobe light was not on. Jorgensen's vehicle traveled 250 feet in the southbound lane before colliding with the wheeler truck.

[¶ 10] Jorgensen was traveling approximately twenty miles per hour. He left brake or skid marks approximately twenty-one feet long leading up to the wheeler. The parties dispute the features of the road around the point of collision; Jorgensen asserts that the road was winding, uphill, and had limited visibility due to a number of blind curves and side roads. He also asserts that the sun was positioned in such a way that the wheeler was not visible to him until the last minute. The Department disputes these factual assertions.

[¶ 11] In March of 2007, the Jorgensens filed a complaint against the Department[1] in the Superior Court, asserting

---

1. Claims against Suburban Security, Inc., the company hired by the Department to provide the flaggers directing traffic on the day of the accident, were dismissed with the consent of

causes of action for negligence and loss of consortium, and stating their intent to obtain legislative special authorization to proceed with damages claims in excess of the $400,000 limit imposed by the Maine Tort Claims Act, *see* 14 M.R.S. § 8105 (2008).[2] The court denied the Department's subsequent motion for a summary judgment in which the Department asserted discretionary function immunity pursuant to 14 M.R.S. § 8104–B(3) (2008).[3] The Department filed this appeal.

## II. DISCUSSION

■ [¶ 12] The Department argues that the court erred in denying its motion for summary judgment based on immunity.[4] We review the trial court's denial of a motion for summary judgment seeking immunity for errors of law, and we view the evidence in the light most favorable to the nonmoving party, in this case, the Jorgensens. *See Rodriguez*, 2007 ME 68, ¶ 19, 922 A.2d at 489. "Whether a defendant is entitled to discretionary function immunity is a question of law." *Tolliver v. Dep't of Transp.*, 2008 ME 83, ¶ 16, 948 A.2d 1223, 1229 (quotation marks omitted).

[¶ 13] Governmental immunity is the subject of the Maine Tort Claims Act (MTCA), 14 M.R.S. §§ 8101–8118 (2008). As a general matter, "all governmental entities shall be immune from suit on any and all tort claims seeking recovery of damages." 14 M.R.S. § 8103(1). The MTCA delineates several exceptions to the

government's entitlement to immunity; one important exception is for road construction and repair: "A governmental entity is liable for its negligent acts or omissions arising out of and occurring during the performance of construction, street cleaning or repair operations on any highway, town way, sidewalk, parking area, causeway, bridge, airport runway or taxiway...." 14 M.R.S. § 8104–A(4). There is no dispute that the Department constitutes a government entity, and that the accident in question occurred during the Department's performance of road construction within the meaning of section 8104–A(4).

[¶ 14] The statute also contains exceptions to these exceptions, however. 14 M.R.S. § 8104–B; *see Tolliver*, 2008 ME 83, ¶ 13, 948 A.2d at 1228. Specifically, the Department has invoked the discretionary function exception, which, if applicable, would afford the Department complete immunity from the Jorgensens' claims.

> Notwithstanding section 8104–A, a governmental entity is not liable for any claim which results from:
>
> . . . .
>
> **3. Performing discretionary function.** Performing or failing to perform a discretionary function or duty, whether or not the discretion is abused and whether or not any statute, charter, ordinance, order, resolution or policy under which the discretionary function or duty is performed is valid or invalid,

---

all parties. There are no issues regarding Suburban Security in this appeal.

**2.** "In any claim or cause of action permitted by this chapter, the award of damages, including costs, against either a governmental entity or its employees, or both, may not exceed $400,000 for any and all claims arising out of a single occurrence." 14 M.R.S. § 8105(1) (2008).

**3.** The court granted the Department's motion as to Karen Jorgensen's loss of consortium claim to the extent she sought compensation for her own lost wages and benefits.

**4.** Although interlocutory, the Department's appeal of the denial of its request for immunity is immediately reviewable pursuant to the death knell exception to the final judgment rule. *See Webb v. Haas*, 1999 ME 74, ¶ 5, 728 A.2d 1261, 1264.

except that if the discretionary function involves the operation of a motor vehicle, as defined in Title 29–A, section 101, subsection 42, this section does not provide immunity for the governmental entity for an employee's negligent operation of the motor vehicle resulting in a collision, regardless of whether the employee has immunity under this chapter;

 . . . .

14 M.R.S. § 8104–B(3). Thus, "section 8104–B(3) provides a governmental entity with discretionary function immunity despite section 8104–A." *Tolliver*, 2008 ME 83, ¶ 14, 948 A.2d at 1229 (quoting *Norton v. Hall*, 2003 ME 118, ¶ 11, 834 A.2d 928, 932) (emphasis omitted).

■ [¶ 15] Discretionary function immunity is a creature of statute, "intended to provide absolute immunity for acts that are uniquely governmental." *Tolliver*, 2008 ME 83, ¶ ¶ 16, 17, 948 A.2d at 1229. It preserves separation of powers in that it prevents the judiciary from considering tort actions as a means to alter policy decisions vested with the other branches of government. *Id.* ¶ 17, 948 A.2d at 1229. Discretionary function immunity has been applied to "negligence . . . associated with a plan or policy developed at a high level of government," and to "discretionary decisions that were integral to the accomplishment of a uniquely governmental policy or program." *Id.* ¶ ¶ 19–20, 948 A.2d at 1230–31; *see also Darling v. Augusta Mental Health Inst.*, 535 A.2d 421 (Me. 1987).

■ [¶ 16] Discretionary function immunity, however, is not intended to protect a government entity from liability for "ministerial acts," which are defined as those acts "to be carried out by employees, by the order of others or of the law, with little personal discretion as to the circumstances in which the act is done." *Tolliver*, 2008 ME 83, ¶ 21, 948 A.2d at 1231

(quotation marks omitted). Thus, "in cases where the questioned conduct has little or no purely governmental content but instead resembles decisions or activities carried on by people generally," discretionary function immunity is not afforded. *Id.* (quotation marks omitted). More specifically, "operational decisions, such as those regarding the safety or maintenance of premises, fall outside the scope of discretionary function immunity." *Id.* ¶ 22, 948 A.2d at 1231 (quotation marks omitted).

■ [¶ 17] We utilize a four-factor test in evaluating the applicability of discretionary function immunity:

(1) Does the challenged act, omission, or decision necessarily involve a basic governmental policy, program or objective? (2) Is the questioned act, omission or decision essential to the realization or accomplishment of that policy, program, or objective as opposed to one which would not change the course or direction of the policy, program, or objective? (3) Does the act, omission, or decision require the exercise of basic policy evaluation, judgment, and expertise on the part of the governmental agency involved? (4) Does the governmental agency involved possess the requisite constitutional, statutory, or lawful authority and duty to do or make the challenged act, omission, or decision?

*Id.* ¶ 19, 948 A.2d at 1230 (quotation marks omitted). There appears to be no dispute that road safety and construction constitute a basic governmental objective, that the Department's acts in completing that construction are essential to the realization of that objective, and that the Department possesses statutory authority to complete road construction. Thus, the only dispute here regards the third factor, i.e., whether the Department's decisions in setting up

the construction zone were indeed discretionary within the meaning of 14 M.R.S. § 8104–B(3).

[¶ 18] The Superior Court did not err in concluding that the Department's acts in the present matter were not discretionary within the meaning of section 8104–B(3). In our recent decision in *Tolliver*, we analyzed the applicability of discretionary function immunity to the acts of Department employees in laying down and striping an edge line on Route 302 in Casco, acts which later were alleged to have caused a motor vehicle accident. *Tolliver*, 2008 ME 83, ¶ 23, 948 A.2d at 1231. We concluded that the Department was not entitled to discretionary function immunity for such acts because no Department employees had engaged in "careful weighing of competing public policy considerations when determining when to complete the striping of the road and whether to use temporary edge line markings." *Id.* Rather, the Department employees were merely "assessing the logical and most efficient way to complete a road improvement project." *Id.* ¶ 23, 948 A.2d at 1232. In short, not all decision-making is entitled to discretionary function immunity; only those more significant decisions involving the weighing of competing public policy considerations are entitled to immunity.

[¶ 19] The parties do not dispute that when a construction zone is set up, there are many factors that have to be considered in order to safely control the flow of traffic, including visibility, traffic volume, roadway layout, hills, curves, intersections, driveways, and speed limits. In setting up a work zone, there are many choices that can be made as to signs, shadow vehicles, flaggers, barriers, cones, drums, and message boards. Nevertheless, we are not persuaded that in most cases, how signs or other implements are used; where they are placed; and how, and how

many, flaggers are employed are the types of decisions informed by public policy considerations, for which the Department was intended to have immunity from liability.

[¶ 20] The legislative history supporting the MTCA indicates that the underlying purpose of discretionary function immunity is to shield the government from costly liability for public policy decisions for which there is no insurance. The Legislative Record underlying the MTCA contains statements that indicate that the Legislature intended that the government "be open to liability [in] certain specific areas, particularly the areas of motor vehicle, equipment, [and] construction" because those were "areas where it appeared likely that an insurance program could be arranged within the reach of the pocketbooks of Maine communities and the State." 2 Legis. Rec. 1644 (1977) (remarks of Sen. Collins). We have also previously noted that "[t]he Legislature created the narrow exceptions to governmental immunity under the assumption that governmental entities would acquire insurance to cover liability for claims outside immunity protection." *Rodriguez*, 2007 ME 68, ¶ 34 n. 4, 922 A.2d at 493. In short, for small agencies in particular, "it is vitally important that there be insurance in the areas where the [agency] is exposed to liability." 2 Legis. Rec. 1644 (1977) (remarks of Sen. Collins). The manner in which a construction zone is set up, including the location and placement of signage, flaggers, cones, and barriers, although requiring some level of discretion, constitute the kind of acts for which insurance *is* available, and generally does not involve decision-making requiring the exercise of "basic policy evaluation, judgment, and expertise on the part of the governmental agency involved" within the meaning of the test for discretionary function immunity. *Tolliver*, 2008 ME 83, ¶ 19, 948 A.2d at 1230 (quotation marks omitted); *accord*

*New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 8, 728 A.2d 673, 676.

[¶ 21] Although the decision to use shoulder grading as a mechanism to increase shoulder height for purposes of public safety may well be the type of discretionary decision to which discretionary function immunity was intended to apply, that decision is not the act of which the Jorgensens complain. Rather, the Jorgensens allege negligence as to how the Department employed the signs, lights, vehicles, and flaggers in the construction zone to move traffic through the area. Although the State could adopt a policy on safety that renders such decisions, or some of them, discretionary, and therefore entitled to immunity, in the instant case, these decisions were made on the ground at the scene of the road repair, and involved merely the Department's assessment of "the logical and most efficient way to complete [the] road improvement project," rather than the balancing of public policy considerations. *See Tolliver*, 2008 ME 83, ¶ 23, 948 A.2d at 1232. We do not disturb the trial court's denial of a summary judgment in favor of the Department based on discretionary function immunity.

The entry is:

Judgment affirmed.