2009 ME 79

**Alan D. KNOWLTON**

v.

**ATTORNEY GENERAL et al.**

Supreme Judicial Court of Maine.

Argued: June 17, 2009.
Decided: July 28, 2009.

Janet T. Mills, Attorney General, Christopher C. Taub, Asst. Atty. Gen. (orally), Augusta, ME, for the Attorney General and the Superintendent of Insurance.

Joseph M. Baldacci, Esq. (orally), Eric M. Mehnert, Esq. (orally), Hawkes & Mehnert, LLP, Bangor, ME, for Alan D. Knowlton.

Panel: SAUFLEY, C.J., and CLIFFORD, ALEXANDER, LEVY, SILVER, and GORMAN, JJ.

LEVY, J.

[¶ 1] This appeal stems from a complaint filed by Alan D. Knowlton seeking money damages against the Attorney General and Superintendent of Insurance for their alleged breach of a consent agreement. The Attorney General and the Superintendent of Insurance (collectively, the State) appeal from the Superior Court's (Penobscot County, *Anderson, J.*) partial denial of their motion for a summary judgment. They assert that the State has sovereign immunity with respect to claims for monetary damages arising out of an alleged breach of the consent agreement. We conclude that the State is immune from suit, vacate the judgment, and remand for entry of a summary judgment in favor of the State.

## I. BACKGROUND

[¶ 2] Viewed in the light most favorable to the nonmoving party, the summary judgment record supports the following facts. *See Jorgensen v. Dep't of Transp.*, 2009 ME 42, ¶ 2, 969 A.2d 912, 914.

[¶ 3] Bankers Life and Casualty Company is an insurance company with offices in Bangor and South Portland. Between January 2002 and April 2005, the Maine Bureau of Insurance received seventy complaints from consumers that the State asserts primarily related to claims that Bankers Life had improperly marketed insurance policies to elderly consumers by, among other things, setting up meetings with older consumers under the guise of discussing changes to the Medicare law and selling annuities that were not actually suitable for elderly people. Approximately thirteen of the seventy complaints involved salespersons out of the Bangor office, and the rest referred to the South Portland office. Knowlton was the branch sales manager of the Bangor Office.

[¶ 4] On March 28, 2005, Knowlton entered into a consent agreement with the State to resolve licensing violations associated with two incidents at a sales recruitment meeting during which he misrepresented the financial strength rating of Bankers Life in a conversation with a potential recruit and through distribution of a misleading brochure. The agreement described the incidents, and required Knowlton to pay a $750 civil penalty, submit to a 270–day period of license probation, and comply with various other requirements concerning recruiting materials and the reporting of consumer complaints. Of particular significance to this appeal, the consent agreement provided:

> In consideration of Mr. Knowlton's execution of and compliance with the terms of this Consent Agreement, the Superintendent and the Attorney General agree to forgo pursuing further disciplinary measures or other civil or administrative sanctions against Mr. Knowlton for the violations described in the Stipulations, other than those agreed to in this Consent Agreement.

[¶ 5] Bankers Life entered into its own consent agreement with the State about two weeks later. Included among the complaints settled by the agreement with Bankers Life were the two concerning the misrepresentation of financial strength that had been brought against Knowlton. The Bankers Life consent agreement was finalized on April 14, 2005. It required, among other things, that Bankers Life "relieve the managers of its South Portland and Bangor branch offices of their positions as branch managers." [1] The Bankers Life and Knowlton consent agreements

---

1. The relevant paragraphs state:
   52. It is the position of the Bureau of

Insurance that the substantial number and

each provided that the agreement was "not subject to review or appeal," and that it "is enforceable by an action in the Superior Court."

[¶ 6]   When Knowlton was informed of his termination as manager of the Bangor office, Bankers Life officials represented to him that "they had 'fought' for his job but that 'the [S]tate wouldn't hear of it' and instead 'demanded' " that Knowlton be removed as manager.   Knowlton now believes that these representations may not have been truthful.   Following a paid leave of absence and subsequent short-term disability leave, Knowlton became a unit sales manager for Bankers Life in Boston.   In July 2006, Bankers Life put Knowlton on an unpaid leave of absence, and after various communications concerning whether Knowlton would accept an additional demotion, he was eventually terminated or constructively discharged by Bankers Life in approximately October 2006.

[¶ 7]   In April 2007, Knowlton brought suit against the State, asserting that the State had breached his consent agreement by entering into the subsequent consent agreement with Bankers Life because the subsequent agreement called for Knowlton's termination as the Bangor branch manager, and Knowlton maintained that that requirement constituted further disciplinary action against him.   He also asserted violations of 42 U.S.C.S. § 1983 (2002) for the deprivation of property without due process of law, alleging that he had been subject to double jeopardy, and for the unconstitutional impairment of contractual obligations.   He also sought a declaratory judgment that the State had breached the consent agreement.   His complaint alleged that he was "forced to leave a position he held for 20 years and has suffered severe and debilitating economic and emotional distress."   It demanded judgment "in such amount as is reasonable in the premises, plus interest, costs and such other and further relief as this Court deems just and proper."

[¶ 8]   The State moved for a summary judgment, asserting, among other things, that the consent agreement with Knowlton was not a contract that would abrogate the State's immunity from suit.   The court granted a summary judgment with respect to all the complaint's counts, except for the breach of contract claim.   In its analysis, the court reasoned that there is "no discernable difference between a settlement agreement in the context of civil litigation and a consent agreement in the context of administrative adjudications;   therefore, the consent agreement in this case should be analyzed as a contract."   The court determined that 10 M.R.S. § 8003(5)(B) (2005),[2] which provides that "[a] consent

nature of consumer complaints received by the Bureau related to Bankers Life and its Maine producers, branch and unit managers, represents an unacceptable level of incompetence with respect to the elderly population to which Bankers Life's products are sold, and a lack of adherence to legal requirements; therefore, neither the South Portland nor Bangor branch can be operated in full compliance with Maine law and this Consent Agreement as those branches are currently operated.   As such, it is necessary for Bankers Life to take serious measures to create a new culture dedicated to the development and maintenance of a strong compliance philosophy.   To that end, Bankers Life agrees to the actions contained in the following paragraphs.

53.   Within 14 days of the effective date of this Agreement, Bankers Life shall relieve the managers of its South Portland and Bangor branch offices of their positions as branch managers.   Bankers Life shall fill the vacant branch manager positions as expeditiously as possible, but with the priority of selecting individuals who are experienced enough to ensure that each branch operates in accordance with Maine law and the terms of this Agreement.

2.   The introductory language in subsection (5), applicable to all subsequent subsections, was

agreement is enforceable by an action in Superior Court," constitutes an explicit waiver of sovereign immunity, permitting "enforcement of a consent agreement in the same way that any other contract may be enforced, including remedies at law and equity." The court further concluded that there was a dispute of material fact as to whether the State had breached Knowlton's consent agreement by entering into the subsequent agreement with Bankers Life.[3] The court denied a subsequent motion by the State for reconsideration.

[¶ 9] The State appeals the court's denial of its motion for a summary judgment on the breach of contract claim, arguing that it is immune from suit, and in the alternative, that the undisputed facts establish that it did not breach the consent agreement. Knowlton has not cross-appealed from the portion of the court's order granting a summary judgment in favor of the State on all other claims.

## II. DISCUSSION

■■■ [¶ 10] An interlocutory appeal from the partial denial of a summary judgment motion is generally precluded by the final judgment rule. *See Webb v. Haas*, 1999 ME 74, ¶ 5, 728 A.2d 1261, 1264. Immediate review is permitted pursuant to the death knell exception, however, where the motion was based on a claim of immu-

nity. *Id.* Such is the case here. We review a court's decision on a summary judgment motion de novo. *Addy v. Jenkins, Inc.*, 2009 ME 46, ¶ 7, 969 A.2d 935, 938.

[¶ 11] The State asserts that it is immune from suit for Knowlton's breach of contract claim, contending that, contrary to the Superior Court's analysis, 10 M.R.S. § 8003(5)(B) does not constitute an explicit or implicit waiver of sovereign immunity. Knowlton counters that, as the Superior Court found, the language of section 8003(5)(B) permitting consent agreements to be enforced in the Superior Court explicitly waives the State's immunity, and that had the Legislature intended to limit that waiver to specific performance actions, it would have done so, in a manner analogous to the cap on damages contained in the Maine Tort Claims Act (MTCA), currently codified at 14 M.R.S. §§ 8101–8118 (2008).[4]

■■■ [¶ 12] In general, "[t]he immunity of the sovereign from suit is one of the highest attributes inherent in the nature of sovereignty" and can only be waived by "specific authority conferred by an enactment of the Legislature." *Drake v. Smith*, 390 A.2d 541, 543 (Me.1978). Waivers are not generally implied, and even explicit waivers are construed narrowly. *See Young v. Greater Portland Transit Dist.*,

---

amended in 2007, but that amendment is not material to our discussion here. *See* P.L. 2007, ch. 402, § C–2 (effective Sept. 20, 2007).

3.  The court concluded that there was a dispute of material fact because the provision of Knowlton's consent agreement requiring that the State refrain from pursuing further action "against" Knowlton was ambiguous. It found that "against" could mean the State only had to refrain from direct actions against Knowlton, or it could mean that the State could not pursue any actions that would have an adverse effect on Knowlton, directly or indirectly, for example, through his employer.

In addition, the court found that there was a dispute of material fact as to whether Knowlton's termination pursuant to the Bankers Life consent decree was based on the same violations as had been addressed in Knowlton's decree.

4.  The Maine Tort Claims Act establishes that governmental entities are immune from suits seeking recovery of damages in tort, with exceptions as expressly delineated in the statute and with explicit limitations on the amount of damages. *See* 14 M.R.S. §§ 8103 ("Immunity from suit"), 8104–A ("Exceptions to immunity") and 8105 ("Limitation on damages") (2008).

535 A.2d 417, 418–19 (Me.1987) (finding that language in a municipal transit district's charter permitting it to "sue or be sued" was not an explicit waiver of governmental immunity divesting the district of the protections of the MTCA).

■ [¶ 13] The rule that waivers of immunity must be explicit is not without exception. Our jurisprudence suggests that "a general statute allowing the State to enter into contracts implies a waiver of sovereign immunity by the Legislature when the State is sued for breach of that contract." *Profit Recovery Group, USA, Inc. v. Comm'r, Dep't of Admin. & Fin. Servs.*, 2005 ME 58, ¶ 28, 871 A.2d 1237, 1244. Thus, at issue here is whether section 8003(5)(B),[5] the statute conferring authority to the Bureau of Insurance to enter into consent agreements to regulate violations by licensees, constitutes either (A) an explicit waiver of sovereign immunity, or (B) a general statutory scheme that permits the Bureau to enter into contracts and which abrogates immunity for a breach.

A. Whether 10 M.R.S. § 8003(5)(B) is an Explicit Waiver of Sovereign Immunity

■ [¶ 14] The plain language of section 8003(5)(B) does not expressly waive sovereign immunity.[6] The sentence in the statute providing that a consent agreement entered into by the Superintendent of Insurance may be enforced in Superior Court is an extension of the Superintendent's general duty to enforce the Insurance Code. *See* 24-A M.R.S. § 211 (2008); 10 M.R.S. §§ 8001(3) (2008); 8003(5)(A–1) (2008). It does not expressly confer to individuals who enter into a consent agreement with the Superintendent a right to sue for damages based on an alleged breach of the agreement. The judicial enforcement of a consent agreement is a remedy that is distinct from compensatory damages awarded for the breach of that agreement. *See* Horton & McGehee, *Maine Civil Remedies* § 4–1 at 56 (4th ed. 2004) (explaining the purpose of compensatory damages). Section 8003(5)(B) is not an explicit waiver of sovereign immunity subjecting the State to an action for damages.

■ [¶ 15] Knowlton contends, however, that the very fact that the language permitting enforcement of agreements in section 8003(5)(B) does not contain an express limitation on damages, such as that included in the MTCA, establishes that damages are permitted without limitation. We disagree. Sovereign immunity is the rule and not the exception. *New Orleans*

---

5. Title 10 M.R.S. § 8003(5)(B) states:

   **B.** The bureau, office, board or commission may execute a consent agreement that resolves a complaint or investigation without further proceedings. Consent agreements may be entered into only with the consent of: the applicant, licensee or registrant; the bureau, office, board or commission; and the Department of the Attorney General. Any remedy, penalty or fine that is otherwise available by law, even if only in the jurisdiction of the Superior Court, may be achieved by consent agreement, including long-term suspension and permanent revocation of a professional or occupational license or registration. A consent agreement is not subject to review or appeal, and may be modified only by a writing executed by all parties to the original consent agreement. *A consent agreement is enforceable by an action in Superior Court.*
   (Emphasis added.)

6. The State relies on *State v. Weinschenk*, 2005 ME 28, 868 A.2d 200, in support of the proposition that the Legislature did not explicitly waive sovereign immunity in 10 M.R.S. § 8003(5)(B). In that case, however, although the trial court had concluded that there was no waiver for a claim based on a violation of a consent decree, we never reached the issue and affirmed the judgment on different grounds. *Id.* ¶ 30, 868 A.2d at 209–10.

*Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 5, 728 A.2d 673, 675 (recognizing that "we start from the premise that immunity is the rule and exceptions to immunity are to be strictly construed"). Knowlton's argument cannot be squared with the established practice of construing a waiver narrowly. *See id.; see also Reid v. Town of Mount Vernon*, 2007 ME 125, ¶¶ 23, 27, 932 A.2d 539, 545–46 (noting that in the context of the State's potential liability for negligence in regards to the phrase "other machinery or equipment" in the MTCA, those terms should be construed narrowly). Section 8003(5)(B)'s silence regarding damages indicates the absence of a waiver of immunity from suits for damages, not the opposite.

B.    Whether 10 M.R.S. § 8003(5)(B) Constitutes a General Statute That Allows the State to Enter into Contracts and Results in the Abrogation of Sovereign Immunity

■    [¶ 16]  As previously noted, a general statute that contemplates that the State will become a party to a traditional contract may be sufficient to waive immunity. For example, in *Profit Recovery Group*, we noted that pursuant to statute, the State Controller had the authority to approve contracts and "incur financial obligations against the State Government" in determining whether the State was liable for pre- and post-judgment interest claims stemming from a finding of a breach of contract. 2005 ME 58, ¶¶ 27–28, 871 A.2d

at 1244 (quotation marks omitted); *see also A.F.A.B., Inc., v. Town of Old Orchard Beach*, 639 A.2d 103, 106 n. 4 (Me. 1994) (noting that when considering whether a governmental entity should be immune from liability for unjust enrichment, one relevant circumstance courts should consider "is whether the municipality was acting in its governmental capacity or a proprietary role"). Thus, we might deem the State's immunity to have been abrogated "where the Legislature has enacted a general statutory scheme plainly contemplating that the State will become a party to express contracts concerning a particular subject-matter." *Drake*, 390 A.2d at 545.

■    [¶ 17]  Accordingly, for purposes of sovereign immunity, a distinction is properly drawn between a statute that authorizes the State to enter into contracts in its proprietary role involving the establishment of financial obligations between the State and a private actor, and a statute that authorizes the State to resolve regulation enforcement proceedings by consent agreement in the exercise of its police powers.[7] The former is represented by 24–A M.R.S. § 208 (2008), which authorizes the Superintendent of Insurance "from time to time to contract for such additional actuarial, examination, rating and other technical and professional services as he may require for discharge of his duties," thus also conferring on the Superintendent authority to incur financial

---

7.    A similar dichotomy is apparent in federal contract law. For example, in interpreting 28 U.S.C. § 1491 (2000), providing that the Court of Claims has jurisdiction over "claims against the United States founded ... upon any express or implied contract with the United States," the Court of Claims has held that its jurisdiction "does not extend to contracts entered into by the Government in its sovereign capacity that do not unmistakably subject the United States to damages in the event of breach." *Trudeau v. United States*, 68 Fed.

Cl. 121, 127 (2005), *aff'd*, 186 Fed.Appx. 998 (Fed.Cir.2006). In *Trudeau*, the court held that it did not have jurisdiction over an action brought against the Federal Trade Commission for its alleged breach of a stipulated order arising out of the settlement of an enforcement action, because the government was acting in its sovereign capacity and the order did not contain a provision unmistakably subjecting it to monetary liability for breach. *Id.* at 130–31.

liability in a contract. The latter is represented by section 8003(5)(B), which permits the Superintendent to enter into a consent agreement that "resolves a complaint or investigation" as part of its authority, as the sovereign, to regulate the insurance industry.

[¶ 18] Because a consent agreement made pursuant to section 8003(5)(B) is in furtherance of the Superintendent's duty to protect the public interest through enforcement of the Insurance Code, it does not give rise to an implicit waiver of the State's sovereign immunity from claims for breach of contract.[8]

The entry is:

Judgment as to the breach of contract claim vacated. Case remanded for entry of a summary judgment on Knowlton's breach of contract claim in favor of the State based on sovereign immunity.

---

8. We are not persuaded by and do not separately address Knowlton's remaining arguments.