# United States Court of Appeals
## For the First Circuit

No. 12-1251

ALAN D. KNOWLTON,

Plaintiff, Appellant,

v.

JUDITH SHAW; ANDREW BLACK; GLENN GRISWOLD,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. John A. Woodcock, Jr., U.S. District Judge]

Before

Torruella, Boudin,[*] and Thompson,
Circuit Judges.

Eric M. Mehnert, with whom Hawkes & Mehnert, LLP, was on brief for appellant.
Rosie M. Williams, with whom Edward R. Benjamin, Jr. and Thompson & Bowie, LLP, were on brief for appellee Andrew Black.
Martin J. Ridge, with whom Beagle & Ridge, LLC, was on brief for appellee Judith Shaw.
Russell B. Pierce, with whom Norman, Hanson & DeTroy, LLC, was

---

[*]Judge Boudin heard oral argument in this matter, and participated in the semble, but he did not participate in the issuance of the panel's opinion in this case. The remaining two panelists therefore issued the opinion pursuant to 28 U.S.C. § 46(d).

on brief for appellee Glenn Griswold.

_____

January 4, 2013

_____

**THOMPSON**, **Circuit Judge**.  An investigation into the questionable business practices of Appellant Alan D. Knowlton's employer, Bankers Life and Casualty Co. ("Bankers Life" or "the Company"), eventually led the Maine Bureau of Insurance ("the Bureau") and the Maine Attorney General's Office ("the AG's Office") to Knowlton's front door.  In exchange for Knowlton accepting responsibility for his own unlawful conduct, Appellees Judith Shaw, Glenn Griswold and Andrew Black (collectively, "the state officials"), representing the Bureau and the AG's Office, agreed to take no further action against Knowlton.  That promise turned out to be short-lived, however, when they agreed to Knowlton's termination in a separate agreement with Bankers Life.  Knowlton appeals the district court's dismissal of his complaint against the state officials.  We affirm.

## BACKGROUND

As this case comes before us on a grant of a motion to dismiss, we treat as true all well-pleaded facts, viewing those facts in the light most favorable to the plaintiff, and drawing all reasonable inferences therefrom for him.  Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008).  We recite only the relevant facts.

In or around 2001, the Bureau began investigating Bankers Life's improper marketing practices targeting elderly consumers.  Shaw, the Bureau's Deputy Superintendent, became involved and initiated a parallel investigation into Bankers Life's sales

practices. Griswold, Director of the Consumer Healthcare Division of the Bureau, led that investigation. In or around January 2005, after finding that Bankers Life had engaged in improper sales practices in Maine, Assistant Attorney General Black, Shaw and Griswold began negotiating with Bankers Life to resolve those claims.

Bankers Life was not the only one on the state officials' radar, however. Shaw, Griswold and Black quickly turned their attention to Knowlton, the Company's Branch Sales Manager in Bangor, Maine, after learning about his November 2004 sales recruitment meeting. At that meeting, he distributed materials representing that Bankers Life had an "A" rating by A.M. Best Company,[1] when its rating was actually a "B++." In response to an attendee's comment that he was pleased about the "A" rating, Knowlton said he hoped to see it improve.

On the heels of the investigation into Knowlton's actions, Knowlton entered into a consent agreement with the AG's Office and the Bureau to resolve licensing violations associated with the sales recruitment meeting and his conversation with the potential recruit. In the agreement, Knowlton admitted that he violated the Maine Insurance Code, Me. Rev. Stat. tit. 24-A, § 1, *et seq.*, by distributing materials containing a misleading representation about

---

[1]A.M. Best Company is the leading provider of financial ratings for insurance companies.

Bankers Life's financial condition and by acknowledging the attendee's comment about the A.M. Best Company rating. In addition to accepting responsibility for those violations, he agreed to submit to a 60-day suspension of his insurance producer license and a 270-day period of license probation, pay a civil penalty of $750.00, and comply with other requirements regarding recruiting materials and the reporting of consumer complaints. In exchange, the Bureau and the AG's Office agreed to "forgo pursuing further disciplinary measures or other civil or administrative sanctions against [him] for the violations" described in the agreement.

Not one week passed before the Bureau and the AG's Office entered into a separate consent agreement with Bankers Life to resolve the claims against it. During their negotiations, the Bureau accepted Bankers Life's proposal that the branch managers of its South Portland and Bangor branch offices (which included Knowlton's position as the Bangor branch manager) be terminated. Thus, the agreement called for Bankers Life to "relieve the managers of its South Portland and Bangor branch offices of their

positions as branch managers."[2]  Bankers Life terminated Knowlton's

position as branch manager on April 14, 2005.[3]

Knowlton's complaint asserts claims against Shaw, Black and

Griswold in their individual capacities for violations of 42 U.S.C.

§ 1983 and 42 U.S.C. § 1985(2).  Specifically, the complaint

alleges that by agreeing to Bankers Life's termination of

Knowlton's position as branch manager, the appellees deprived

Knowlton of continued employment with the Company without due

process under § 1983.  The complaint adds that Shaw, Black and

Griswold violated his rights under § 1985(2) by participating in a

conspiracy with the Bureau and Bankers Life to deprive him of his

rights to challenge the termination provision in the consent

agreement.

The state officials moved to dismiss the complaint on several

grounds, including absolute immunity for the § 1983 claim.  In

granting the motion, the district court agreed that absolute

immunity protected the state officials from liability.  The court

---

[2]Knowlton claims that Bankers Life proposed terminating his employment to avoid an audit (originally requested by the Bureau) of the Company's Bangor and South Portland Branch Sales Managers' practices which would have involved an investigation of a sales manager who was one of Bankers Life's top producers.

[3]After Bankers Life relieved Knowlton of his position as branch manager, he took a 90-day paid leave of absence and worked as a Unit Sales Manager in Bankers Life's Boston office until around July 2006.  As best we can tell from the record, Knowlton's employment with the Company ended sometime thereafter.

further concluded that Knowlton failed to plead a plausible §
1985(2) claim, and rejected his argument that the state officials
were judicially estopped from denying liability under § 1983 based
on a prior civil suit Knowlton had filed against the State for
breach of contract (more on that later).  Knowlton now appeals.

## DISCUSSION

We review de novo the grant of a motion to dismiss under Rule
12(b)(6).  Feliciano-Hernández v. Pereira-Castillo, 663 F.3d 527,
532 (1st Cir. 2011), cert. denied, __ U.S. __, 132 S. Ct. 2742
(2012).

## Absolute Immunity

We first consider whether the district court erred in
dismissing Knowlton's due process claim on the basis that the state
officials had absolute immunity from suit.

While "[t]he presumption is that qualified rather than absolute
immunity is sufficient to protect government officials in the
exercise of their duties," Burns v. Reed, 500 U.S. 478, 486-87
(1991), "there are some officials whose special functions require
a full exemption from liability." Butz v. Economou, 438 U.S. 478,
508 (1978).[4]   Judges and prosecutors are entitled to absolute

_____

[4]Qualified immunity will bar a civil action against a
government official unless the plaintiff has alleged the
deprivation of a constitutional right that was clearly established
at the time of the alleged violation. Conn v. Gabbert, 526 U.S.
286, 290 (1999). Absolute immunity, on the other hand, acts as a
"complete bar" to damages claims of any sort, constitutional or
otherwise. Acevedo-Cordero v. Cordero-Santiago, 958 F.2d 20, 22

immunity when functioning in their official capacities. Butz, 438 U.S. at 508-10. Prosecutors, for example, are absolutely immune for actions, taken as advocates for the State, which are closely associated with the judicial process such as initiating and pursuing a criminal prosecution. Imbler v. Pachtman, 424 U.S. 409, 430-31 & n.33 (1976); Burns, 500 U.S. at 479. That absolute immunity, as Knowlton concedes, extends to non-prosecutor officials of government agencies "performing certain functions analogous to those of a prosecutor." Butz, 438 U.S. at 515. Absolute immunity, however, is not available to either prosecutors or agency officials whose actions are primarily administrative or investigative in nature and unrelated to their functions as advocates in preparing for the initiation of a prosecution or for judicial proceedings. Buckley v. Fitzsimmons, 509 U.S. 259, 273 (1993); see Burns, 500 U.S. at 495 (no absolute immunity for prosecutor providing legal advice to police regarding interrogation practices).

In considering whether absolute immunity attaches to an official's conduct, we employ a "functional approach," Buckley, 509 U.S. at 269; Harrington v. Almy, 977 F.2d 37, 40 (1st Cir. 1992) ("[T]he availability of absolute immunity turns on a functional analysis."), which looks to the "nature of the function performed," not the identity of the actor who performed it. See Forrester v. White, 484 U.S. 219, 229 (1988); Buckley, 509 U.S. at

_____

(1st Cir. 1992).

269; <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920, 931 n.12 (1st Cir. 1992) ("Absolute immunity depends not on the titles of officials but their functions."). Officials claiming absolute immunity, like the state officials here, bear the burden of proving their actions warrant that protection. <u>Buckley</u>, 509 U.S. at 274.

Knowlton argues that the district court got it wrong: negotiating and executing the consent agreements to resolve the civil violations against Bankers Life and Knowlton, he argues, were not prosecutorial-type functions protected by absolute immunity, but rather were actions taken in the state officials' administrative and investigative capacities which do not afford them absolute immunity. The question before us is whether the state officials' actions were, as the district court found, prosecutorial in nature to warrant absolute immunity. We agree that they were.

Shaw and Griswold, as representatives of the Bureau, have the duty and authority to enforce Maine's insurance laws, and through the AG (Black), may "invoke the aid of the Superior Court through proceedings" to enforce any action taken by the Bureau or pursue criminal prosecution based on violations of the Code. Me. Rev. Stat. tit. 24-A, § 214; <u>see also</u> <u>id.</u>, § 211.[5] An enforcement

---

[5]As indicated in the consent agreement, "[t]he Superintendent of [the Maine Bureau] of Insurance is the official charged with administering and enforcing the insurance laws of the State of Maine."

petition need not, however, reach an administrative proceeding or even the courthouse door.  The Bureau may decide to execute consent agreements that impose penalties or fines authorized by law to "resolve[] a complaint or investigation without further proceedings."  Me. Rev. Stat. tit. 10 § 8003(5)(B).[6]  Vested with that authority, Shaw, Griswold, and Black made a judgment call on how to best address Bankers Life's and Knowlton's violations of the Maine Insurance Code.  On the Bureau's and AG's behalf, they decided to forego further proceedings (be it administrative or in-court) related to those violations and entered into consent agreements to resolve them instead (including the agreement with Bankers Life that called for Knowlton's termination).[7]  The decision to resolve the violations before pursuing further proceedings not only arose directly from their roles as the State's advocates in enforcing Maine's insurance laws, but was inextricably related to the judicial process.  The state officials took these

---

[6]Those agreements may only be entered into if the Bureau, the AG, and, as relevant in this case, the licensee consent.  Me. Rev. Stat. tit. 10, § 8003(5)(B).  These consent agreements are not subject to review or appeal and may be enforced by an action in Superior Court.  Id.

[7]Knowlton entered into the consent agreement specifically "to resolve, without an adjudicatory proceeding, the charges against [him] contained in the Petition to Enforce in this matter dated January 4, 2005" regarding his violations of the Maine Insurance Code.  Bankers Life entered into the consent agreement "to resolve, without resort to an adjudicatory proceeding, [its] failure to comply with the requirements of the Maine Insurance Code" as set forth in the agreement.

-10-

actions in preparing for the initiation of the enforcement proceeding -- a proceeding that would have surely followed had no consent agreement been executed.

An agency official's decision to initiate administrative proceedings "aimed at legal sanctions," Wang v. New Hampshire Bd. of Registration in Med., 55 F.3d 698, 701 (1st Cir. 1995), is discretionary, "very much like [a] prosecutor's decision to initiate or move forward with a criminal prosecution" and is, therefore, entitled to absolute immunity. Butz, 438 U.S. at 515; see Wang, 55 F.3d at 701 (finding that state medical board counsel involved in disciplinary proceedings before state medical licensing board were entitled to absolute immunity). Absolute immunity "insulate[s] the decisionmaking process from the harassment of prospective litigation." Westfall v. Erwin, 484 U.S. 292, 295 (1988), superseded by statute on other grounds, Pub. L. No. 100-694, 102 Stat. 4563 (1988), codified at 28 U.S.C. § 2679(d). Such harassment "would cause a deflection" of an official's energies from carrying out his official duties, and "the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." Imbler, 424 U.S. at 423. In this way, absolute immunity promotes "effective government," where officials are "freed of the costs of vexatious and often frivolous damages suits," Westfall, 484 U.S. at 295, that may result from their decisions.

-11-

While no administrative proceeding was initiated in this case (only a petition to enforce was issued), we see no meaningful difference between the nature of an agency official's decision to pursue an administrative proceeding and that of her decision to resolve a violation before reaching that step. In both instances, the agency official acts as the State's advocate, exercising her "broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought." Butz, 438 U.S. at 515; see Romano v. Bible, 169 F.3d 1182, 1187 (9th Cir. 1999) (finding that Gaming Control Board was entitled to absolute immunity for initiating disciplinary proceedings against the plaintiff and entering into settlement negotiations with him, actions which were prosecutorial in nature). The discretion officials exercise in deciding which cases should move forward to further legal proceedings and which may be resolved with consent agreements "might be distorted if their immunity from damages arising from that decision was less than complete." Butz, 438 U.S. at 515. Indeed, in noting the "serious danger" that an official's "decision to authorize proceedings will provoke a retaliatory response," Butz considered it unlikely that anyone would be "willing and legally able to seek damages from the officials" for "not authoriz[ing] [an] administrative proceeding." 438 U.S. at 515 (emphasis in original).

In an attempt to show that absolute immunity is nonetheless unavailable here, Knowlton argues that the state officials' decision to execute the consent agreements was administrative and investigative in nature but he fails to fully develop that argument. As best we can tell, Knowlton appears to argue that his case is analogous to Burns and Buckley.[8]  The state officials' actions here, however, are far from those the Supreme Court found to be administrative and investigative in those cases. Burns held that absolute immunity protected a prosecutor's appearance at a probable cause hearing, but did not similarly protect his actions in giving legal advice to the police.[9]  In finding that giving legal advice to the police was not a function "closely associated with the judicial process," but closer to an investigative function, the Court explained that "[a]lmost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to

---

[8]Knowlton cites Buckley but refers to the holding in Burns to support his argument.  We nonetheless address both Burns and Buckley.

[9]There, the § 1983 suit challenged a prosecutor's act in giving legal advice to the police on the propriety of hypnotizing a suspect and on whether probable cause existed to arrest the suspect, and participating in a probable cause hearing.  The prosecutor's appearance at the probable cause hearing was entitled to absolute immunity since it was "'intimately associated with the judicial phase of the criminal process,'" Burns, 500 U.S. at 492 (quoting Imbler, 424 U.S. at 430), and involved his "'role as advocate for the State.'" Burns, 500 U.S. at 491 (quoting Imbler, 424 U.S. at 431 n.33).

-13-

the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." Burns, 500 U.S. at 495. Similarly, Buckley held that the prosecutors were not entitled to absolute immunity for allegedly "fabricating evidence during the preliminary investigation of a crime" which the Supreme Court found to be "entirely investigative" activity. 509 U.S. at 261, 274. There, the prosecutor had not asserted "probable cause to arrest petitioner or to initiate judicial proceedings during that period," and without probable cause to have anyone arrested, the Court reasoned, a prosecutor "neither is, nor should consider himself to be, an advocate." Id. at 274. Buckley warned that a prosecutor cannot "shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial." Id. at 276.

Burns and Buckley teach us that investigative steps taken to search for "clues and corroboration" that might lead to an arrest are more removed from the judicial process and merit only qualified immunity. Buckley, 509 U.S. at 273; see Giraldo v. Kessler, 694 F.3d 161, 166 (2d Cir. 2012) (noting that "investigative acts that are entitled to only qualified immunity are those undertaken in the phase of law enforcement that involves the gathering and piecing together of evidence for indications of criminal activities and determination of the perpetrators"). But here, the state

-14-

officials' execution of the consent agreements was not part of any investigative activity. By the time the consent agreements were on the table, the investigation had already revealed Knowlton's and Bankers Life's violations of Maine's insurance laws. The agreements resolved those violations and allowed all parties to avoid further legal proceedings on the matter.

In one last ditch effort to save his case, Knowlton argues that the state officials' actions were not subject to "judicial oversight" and, as a result, cannot be entitled to absolute immunity. To support that argument, Knowlton relies on Butz, a § 1983 case involving administrative proceedings brought by federal agency officials. Butz, 438 U.S. at 480.[10] In finding the officials were entitled to absolute immunity for initiating administrative proceedings, Butz noted the proceedings provided certain safeguards to the defendant -- i.e., "checks on agency zeal" and an "opportunity" for the defendant to challenge the "legality" of the proceeding itself. 438 U.S. at 515-16. Latching onto that language, Knowlton claims that under Butz, absolute immunity is available to agency officials only if an administrative proceeding is held to provide those safeguards. While Butz in no way stands for such a broad proposition, Knowlton applies that

_____

[10]Knowlton also cites Wang, 55 F.3d at 701 (disciplinary proceedings before state medical licensing board), to support his argument that the agency officials there would not have been able to claim absolute immunity had no administrative proceeding taken place. Wang says nothing of the sort.

-15-

distorted reading of Butz to his case and argues that the state officials' actions cannot be absolutely immune because no administrative proceeding took place here.  Without an administrative proceeding, he says, no safeguards were present to protect his employment when the state officials agreed to the termination provision in their consent agreement with Bankers Life. Knowlton contends that the proceeding would have given him the opportunity (as a non-party to the agreement) to contest the termination provision and that without that opportunity, he was left defenseless and unable to protect his employment.

The state officials' decision to agree to the termination provision, however, need not be "put in the framework for adversarial testing and judicial supervision," for absolute immunity to apply. Harrington, 977 F.2d at 42. The "availability of the safeguards" which arise from an adversarial setting or judicial supervision are "not necessary preconditions" to claiming absolute immunity. Id. (discussing Imbler).  The crux of Knowlton's argument is that the state officials abused their discretion when they agreed to allow Knowlton's termination in one agreement after they had agreed to take no additional action against him in another.[11]  Those, like Knowlton, who believe they

---

[11]Although it is true, as Knowlton argues, that Bankers Life's compliance with the agreement (of which Knowlton had no part) harmed Knowlton given that he lost his job, it is simply "irrelevant" to the question whether the conduct (namely, the negotiation and execution of the consent agreements) in the first

have been wronged have "readily available safeguards," Harrington, 977 F.2d at 42, to "deter" or "punish" that type of alleged "misconduct" when absolute immunity protects the official from liability in a § 1983 suit. Imbler, 424 U.S. at 428-29. In Knowlton's case, filing a State Personnel Complaint in Maine and reporting any attorney misconduct to Maine's Board of Overseers of the Bar are among the safeguards available to address the discretionary abuse he claims occurred.[12]

In sum, the state officials carried their burden in establishing they are entitled to absolute immunity for entering into the consent agreements with Knowlton and Bankers Life. Given our ruling, we need not reach whether qualified immunity applies or delve into the merits of Knowlton's due process claim.

---

instance is protected by absolute immunity. Buckley, 509 U.S. at 272. The functional approach requires us to keep our focus "on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." Id. at 271. And, the conduct at the heart of Knowlton's complaint is the state officials' execution of the consent agreements at issue.

[12]Knowlton also argues that the state officials' actions cannot be considered prosecutorial functions because his consent agreement was not an enforceable plea agreement. Despite the questionable legal basis for this assertion, it is sufficient to point out that Knowlton failed to raise this argument before the district court (at least according to the record before us) and has thus waived it. Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59 v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992) ("[L]egal theories not raised squarely in the lower court cannot be broached for the first time on appeal.").

## Judicial Estoppel

Knowlton next argues that the state officials should have been judicially estopped from asserting an immunity defense for the § 1983 claim.  We review the district court's decision not to invoke judicial estoppel for abuse of discretion.  Alt. Sys. Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 30 (1st Cir. 2004); Perry v. Blum, 629 F.3d 1, 8 (1st Cir. 2010).  "Within that rubric, we accept the trial court's findings of fact unless they are clearly erroneous, and evaluate its answers to abstract questions of law de novo."  Perry, 629 F.3d at 8 (internal citations omitted).

"[J]udicial estoppel is an equitable doctrine," New Hampshire v. Maine, 532 U.S. 742, 750 (2001) (internal quotation marks and citation omitted), intended to "prevent[] a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding."  InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003).  It protects "the integrity of the courts by preventing parties from improperly manipulating the machinery of the judicial system."  Alt. Sys. Concepts, 374 F.3d at 33.

Although the contours of judicial estoppel may be hazy, courts generally consider three factors before invoking the doctrine in a particular case.  Perry, 629 F.3d at 8-9.  First, a party's earlier and later positions must be "clearly inconsistent."  New Hampshire, 532 U.S. at 750; Alt. Sys. Concepts, 374 F.3d at 33.  Second, the

-18-

party must have succeeded in persuading a court to accept the party's earlier position. Alt. Sys. Concepts, 374 F.3d at 33. "Third, the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." Perry, 629 F.3d at 9; New Hampshire, 532 U.S. at 751.

Knowlton contends that the state officials should not be able to claim immunity for the § 1983 claim when, in his view, they had just represented to the Maine Supreme Judicial Court in a previous lawsuit that he had a viable claim. See Knowlton v. Attorney General, 976 A.2d 973, 975-76 (Me. 2009). In that lawsuit, Knowlton sued the State for breach of contract (the consent agreement between Knowlton and the State). Id. at 975.[13]

Knowlton faces an uphill battle with his argument. For one thing, a party against whom judicial estoppel is invoked, typically, must be the same party who made the prior inconsistent representation. See, e.g., Perry, 629 F.3d at 8 (explaining that judicial estoppel "operates to prevent a litigant from taking a litigation position that is inconsistent with a litigation position

---

[13]Specifically, Knowlton asserted that the State had breached his consent agreement by entering into the subsequent consent agreement with Bankers Life because the subsequent agreement called for Knowlton's termination as the Bangor branch manager, and Knowlton maintained that requirement constituted further disciplinary action against him. The Maine Supreme Judicial Court vacated a judgment in favor of Knowlton, concluding that sovereign immunity shielded the State from liability. Knowlton, 976 A.2d at 980.

successfully asserted by him" in the same or earlier proceeding); Brewer v. Madigan, 945 F.2d 449, 455 (1st Cir. 1991) (explaining that judicial estoppel prevents "a party from taking a position inconsistent with one successfully and unequivocally asserted by that same party in a prior proceeding"). As the district court recognized, the party asserting the alleged "position" in state court and the parties here are not the same. In the state court action, Knowlton sued the State. In this case, Knowlton sued three state officials in their individual capacities only.

For another, even assuming the parties were the same, we see no clear inconsistency between the position taken before the Maine Supreme Judicial Court and that taken below. A close look at the record tells us why. During oral argument before the Maine Supreme Judicial Court, in response to Justice Silver's comment that the State may be immune from suit but had not acted "honorably," the State, represented by an Assistant Attorney General ("AAG"), said that it "may or may not have acted properly in this case" but that "there is a section 1983 remedy for that I think." Justice Silver followed up with the more direct question, asking whether Knowlton indeed had a § 1983 remedy. The AAG clarified that the State was "not saying [Knowlton] would prevail on a [section] 1983 claim" but that he thought "a [section] 1983 claim is the vehicle by which [Knowlton] could address whether what the State did was fair." Contrary to Knowlton's interpretation of the AAG's statements, the

AAG specifically declined to take a position one way or the other regarding the viability of a § 1983 claim, merely noting that bringing a section 1983 action may be the "vehicle" through which Knowlton could address a potential due process claim.

Finally, as we have made clear, "a proponent of judicial estoppel must affirmatively show, by competent evidence or inescapable inference, that the prior court adopted or relied upon the previous inconsistent assertion." Perry, 629 F.3d at 11-12. On this record, Knowlton, as the party pressing judicial estoppel, has failed to demonstrate that the Maine Supreme Judicial Court accepted the AAG's alleged representation that Knowlton had an actionable § 1983 claim to seek redress for the alleged unfair treatment he received. The Court's ruling in that case resolved one issue: whether the State had waived its sovereign immunity regarding Knowlton's breach of contract claim. Knowlton, 976 A.2d at 978. Nothing about the decision permits us to draw even the slightest inference that the Court determined the State had not waived its sovereign immunity based on any acceptance of or reliance upon the AAG's representation that Knowlton might have a viable § 1983 claim. See id.[14] We therefore cannot conclude that

---

[14]While "courts sometimes have allowed judicial estoppel when the estopped party was responsible in fact for the earlier representation, or when the estopped party was the assignee of a litigation claim or assumed the original party's role," Perry, 629 F.3d at 9 (internal citations omitted), Knowlton does not contend that any of these exceptions apply.

the district court abused its discretion in refusing to invoke the doctrine of judicial estoppel.

## 42 U.S.C. § 1985(2) claim

Lastly, Knowlton challenges the district court's finding that the complaint failed to plead a plausible § 1985(2) claim. The second clause of § 1985(2), which Knowlton claims applies here, prohibits conspiracies to obstruct "the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws."[15] Because that language is "directed toward 'the equal protection of the laws,'" a plaintiff must allege a "class-based, invidiously discriminatory animus" to state a plausible § 1985(2) claim. Hahn v. Sargent, 523 F.2d 461, 469 (1st Cir. 1975) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); Schneider v. Tretola, 8 F.3d 809 (1st Cir. 1993) (per curiam) (unpublished).

While the complaint alleges that the state officials conspired with others to deprive Knowlton of a constitutionally protected property interest -- i.e., his job with Bankers Life -- it fails to

---

[15]The first clause of § 1985(2) covers conspiracies to interfere with justice in the federal courts. The second clause, on the other hand, covers conspiracies to interfere with justice in the state courts "with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2); see Kush v. Rutledge, 460 U.S. 719, 725 (1983) (identifying the different classes of unlawful conspiratorial activity under § 1985).

-22-

allege any racial, or otherwise class-based, invidiously discriminatory animus underlying the state officials' actions. As the district court properly concluded, the complaint's failure to do so dooms Knowlton's § 1985(2) claim. See, e.g., Hahn, 523 F.3d at 469 (finding allegation of invidiously discriminatory animus is required to state a claim under the portion of § 1985(2) proscribing conspiracies to interfere with the administration of justice in state courts); Schneider, 8 F.3d at 809 (finding meritless plaintiff's § 1985(2) claim for obstruction of state court proceedings for failure to allege that defendants were motivated by any class-based, invidiously discriminatory animus); see also Mason v. Village of El Portal, 240 F.3d 1337, 1340 (11th Cir. 2001) (failure to establish invidiously discriminatory racial animus behind conspiratorial decision defeated § 1985(2) claim). Accordingly, Knowlton's § 1985(2) claim was properly dismissed.

## CONCLUSION

In the end, we **affirm** the district court's dismissal of Knowlton's claims against the state officials.