ZIEGLER and wife, Respondents, v. WONN and others, Appellants.

*November 27, 1962—January 8, 1963.*

For the appellants there was a brief by *Arthur, Dewa, Tomlinson & Thomas,* and oral argument by *Robert W. Aagaard,* all of Madison.

For the respondents there was a brief by *La Follette, Sinykin, Doyle & Anderson,* attorneys, and *Gordon Sinykin* and *Shirley S. Abrahamson* of counsel, all of Madison, and oral argument by *Mrs. Abrahamson* and *Mr. Sinykin.*

CURRIE, J. Defendants contend on this appeal that there is no credible evidence to sustain the jury's findings, viz., that the explosion caused the damage to the well and that plaintiffs' damages were $1,200. In passing on these two contentions it is elementary that the evidence must be considered in the light most favorable to sustain the verdict. *Smith v. Benjamin* (1952), 261 Wis. 548, 550, 53 N. W. (2d) 619. Furthermore, it is only necessary to consider such evidence as will sustain the verdict. *Olson v. Milwaukee Automobile Ins. Co.* (1954), 266 Wis. 106, 109, 62 N. W. (2d) 549, 63 N. W. (2d) 740.

## *Causation.*

In Wisconsin, one who blasts with high explosives is absolutely liable for damages caused thereby to the property of others in the vicinity irrespective of negligence and of

whether the damage is caused by hurled stones or debris, or by concussion and vibration in the surrounding earth or air. *Brown v. L. S. Lunder Construction Co.* (1942), 240 Wis. 122, 2 N. W. (2d) 859. Thus, the instant special verdict omitted a negligence question and included only causation and damage questions.

Shortly after Baumgardt set off the blast in the quarry on June 27, 1960, the water from plaintiffs' well showed evidence of discoloration. The day after the blast the water had an earthy taste, and on the ensuing day no water could be obtained from the well. The blast had been severe enough to break several windows in plaintiffs' barn located near the well. The wife of the tenant, who occupied the house supplied by water from the well, testified that when the blast occurred everything in the kitchen shook and she then noted a crack in the plaster of the kitchen wall which had not been there before. The parties stipulated on the record both the fact that the blast did occur on June 27, 1960, and other facts with respect to the number and size of the holes drilled into the rock in the quarry and the nature and amount of explosive placed in such holes.

Plaintiffs called as an expert witness one Meyer who is an assistant professor of geology at the University of Wisconsin specializing in geophysics, including seismology. Based on the assumed facts of a hypothetical question, he testified "there is a reasonable probability . . . that the effect on the well is directly related to the explosion at the quarry." We deem that the facts assumed in the hypothetical question fairly stated the uncontroverted relevant facts presented by the evidence in the case. Defendants do not claim otherwise on this appeal. In the field of personal injuries, we have held that opinion testimony of expert

medical witnesses expressing reasonable probability, and not mere possibility, is competent to prove that an accident produced a particular disability. *Hallum v. Omro* (1904), 122 Wis. 337, 342–344, 99 N. W. 1051; *State v. Industrial Comm.* (1956), 272 Wis. 409, 419, 76 N. W. (2d) 362; *Michalski v. Wagner* (1960), 9 Wis. (2d) 22, 27, 100 N. W. (2d) 354. We perceive no reason for making any distinction with respect to opinion testimony between expert medical witnesses in the field of personal injuries and experts in any other field.

We conclude that sufficient credible evidence existed to support the jury's answer to the causation question. Cf. *Engel v. Dunn County* (1956), 273 Wis. 218, 77 N. W. (2d) 408.

### *Damages.*

The principal attack leveled by defendants against the jury's award of $1,200 in damages is that it includes the cost of drilling a new well instead of being limited to the cost of repairing plaintiffs' damaged well. In order to decide this issue, we must review the evidence which tends to support the jury's finding with respect to damages.

The well was 265 feet deep and its steel casing extended to a depth of 20 feet below the earth's surface. Below this casing the well shaft extended through limestone for about 45 feet, then sandy shale, and finally sandstone. In 1959 plaintiffs made extensive improvements to the well as part of a project to provide the tenant house with running water. Prior to that time part of the power for pumping water from the well was supplied by a windmill which stood over the well. As part of the 1959 improvements, a new submersible pump was installed in the well about eight feet above the bottom of the well. Approximately seven feet of new casing

were installed near the top of the well and a pressure tank was added.

When the well ceased to function after the blast, plaintiffs called the plumber who had made the 1959 improvements to the well. He pulled out the pump from the bottom of the well and found it so clogged with mud that it could not operate. He then attached a new pump to the well pipe and attempted to lower it into the position of the old pump. He was unable to do so, however, because of an obstruction in the well shaft near the bottom of the well. This obstruction was apparently above the water level in the well because no water could be pumped from the well. This plumber was of the opinion that this obstruction was due to a cave-in.

Plaintiffs next called in Earl Fuchs, a well driller residing at Prairie du Sac, who had had fifteen years' experience in the well-drilling field. He refused to drill down into the well to remove the obstruction and to loosen up and bail out the material at the bottom of the well. He advised the drilling of a new well which was done. This new well was drilled to a depth of 320 feet about 12 feet away from the old well. During the course of Fuchs' testimony, the following questions were asked him to which he gave the following answers:

"*Q.* What factors influenced you in advising Mr. Ziegler to construct a new well? *A.* First of all, the windmill was setting over the old well and it would have to have been removed before I could set up my drill rig. Second of all, when I go in to reconstruct an old well, I've got to make it like a new one. I'd have to have taken out the pitless tank unit, removed the old casing below the pitless tank unit, drilled a larger hole, installed 40 feet of casing, then go down the old hole, if it is possible to get down. All those things you have to do first and maybe it's all wasted because you don't know whether or not that you are going to get down an old well straight enough to get to the bottom.

"*Q.* Had you had difficulty in the past trying to drill out old wells that had gone dry? *A.* Right. I absolutely won't go in an old well any more; and 90 percent of the drillers in the country won't go into an old well. . . .

"*Q.* Why don't you like to go into an old well when you're willing to drill a brand new one 12 feet away? *A.* When I set up on a hole like that 265 feet of drill pipe and the bit at $15 per foot and have a chance of leaving that in the hole, it isn't worth it to me. I'd sooner not drill the well at all. And I start out from the top of the ground, as I run into it I know what I'm running into."

Defendants called as their expert witness Kenneth Corpian, a well driller residing at Boscobel. He testified that a clogged well did not necessarily have to be abandoned because it was feasible to break up the clogging material and bail it out. Corpian stated that, by using a truck with a boom, a windmill could be lifted and laid on its side when necessary to permit the placing of a well-drilling rig over a well. He testified that he used both a rotary drill with steel pipes fastened end-to-end and a drilling machine with a boom and cable. The advantage of the boom-and-cable device lies in its flexibility when operated in a well with a crooked shaft to break up and bail out the material at the bottom of a well. Corpian's estimated charge for doing such work included a moving-in fee of $50 plus an estimated ten hours of work at $8 per hour.

In view of the foregoing testimony by Fuchs and Corpian, we determine that it was for the jury to decide whether plaintiffs should first have been required to try bailing out the old well before drilling a new well. It is apparent from the jury's finding with respect to damages that it accepted Fuchs' testimony that it is customary in the well-drilling trade to drill a new well instead of attempting to drill out a clogged one.

On the basis of this customary procedure, the testimony supports the following breakdown of plaintiffs' damages:

| | |
|---|---|
| Digging new well to depth of old one......$ | 795.00 |
| 20 feet of casing........................ | 55.00 |
| Plumbing work ......................... | 145.00 |
| Repair of old pump...................... | 120.05 |
| Rent allowance made to tenant for week's loss of water from well..................... | 10.00 |
| Expense of hauling water for plaintiffs' cattle until new well was placed in operation.... | 63.00 |
| Total..............$1,188.05 | |

The above computation is proper because defendants are not charged with the cost of either drilling the new well 55 feet deeper than the old well or the additional 20 feet of steel casing installed in the new well.

The above total of $1,188.05 is $11.95 less than the $1,200 awarded by the jury. The latter includes nothing for the broken windows in the barn nor the crack in the plaster in the kitchen of the tenant house. We deem that this $11.95 discrepancy may be disregarded under the *de minimis* principle.

*By the Court.*—Judgment affirmed.

WILKIE, J., took no part.