2009 ME 126

**Vera E. DYER et al.**

v.

**MAINE DRILLING & BLASTING, INC.**

Supreme Judicial Court of Maine.

Argued: Sept. 17, 2009.

Decided: Dec. 17, 2009.

Jeffrey T. Edwards, Esq. (orally), James C. Bush, Esq., Preti, Flaherty, Beliveau & Pachios, LLP, Portland, ME, for Vera E. Dyer, Paul Dyer and Robert Dyer.

Frederick C. Moore, Esq. (orally), Jessica Adler Coro, Esq., Law Offices of Frederick C. Moore, Portland, ME, for Maine Drilling & Blasting, Inc.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Majority: LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

Concurrence/Dissenting: SAUFLEY, C.J., and ALEXANDER, J.

Concurrence/Dissenting: SAUFLEY, C.J.

SILVER, J.

[¶ 1] Vera E., Paul, and Robert Dyer appeal from a summary judgment entered in the Superior Court (Waldo County, *Hjelm, J.*) in favor of Maine Drilling & Blasting, Inc. (Maine Drilling). The Dyers argue that: (1) we should follow the weight of authority and adopt a common law rule of strict liability for abnormally dangerous activities; (2) the trial court erred in concluding that the Dyers failed to generate a genuine issue of material fact regarding a causal relationship between Maine Drilling's blasting activities and damage to their property; and (3) the doctrine of res ipsa loquitur should be available to establish their negligence claims. Because we adopt the Second Restatement's imposition of strict liability for abnormally dangerous activities, *see* Restatement (Second) of Torts §§ 519–520 (1977), and because there remain factual disputes on the issue of causation, we vacate the court's grant of a summary judgment and remand for further proceedings.

## I. CASE HISTORY

[¶ 2] Viewed in the light most favorable to the non-moving party, *see Jorgensen v. Department of Transportation*, 2009 ME 42, ¶ 2, 969 A.2d 912, 914, the summary judgment record supports the following facts.

[¶ 3] Vera Dyer and her sons, Paul and Robert, have a home in Prospect that the family has owned since the 1950s. The home, believed to be over seventy years old, has a cement foundation and floor. A stand-alone garage with a cement floor was constructed in the 1980s.

[¶ 4] On September 22, 2004, Maine Drilling distributed a form notice that informed the Dyers that Maine Drilling would begin blasting rock near the home on or about October 1, 2004, in connection with a construction project to replace the Waldo–Hancock Bridge and bridge access roads.[1] The notice stated that Maine

---

1. The history of this construction project and its relation to the Dyers is stated in some detail in *Dyer v. Department of Transportation*, 2008 ME 106, ¶¶ 2–12, 951 A.2d 821, 823–25.

Drilling uses "the most advanced technologies available ... to measure the seismic effect to the area," and assured the Dyers "that ground vibrations associated with the blasting [would] not exceed the established limits that could potentially cause damage."

[¶ 5] As offered in the notice, Maine Drilling provided a pre-blast survey of the Dyer home. The survey report recorded the surveyor's observation of "some concrete deterioration to [the] west wall" and "cracking to [the] concrete floor," and a slight tilt to a retaining wall behind the garage. Richard Dyer, another son of Vera, thoroughly documented the condition of the home and garage by videotape before blasting began.

[¶ 6] Maine Drilling conducted over 100 blasts between October 2004 and early August 2005. The closest blast was approximately 100 feet from the Dyer home. Vera was inside the home for at least two of the blasts and felt the whole house shake. During other blasts, she was not in the home because Maine Drilling employees advised her to go outside. Vera visited Florida from approximately January through April 2005, and so was absent from her home when blasting occurred during that period. Paul, however, checked on the home several times a week while Vera was in Florida.

[¶ 7] In the early spring of 2005, after the blasting work had begun and while Vera remained in Florida, both Paul and Richard observed several changes from the pre-blasting condition of the home and the garage: (1) the center of the basement floor had dropped as much as three inches; (2) the center beam in the basement that

supported part of the first floor was sagging, and as a result the first floor itself was noticeably unlevel; (3) there was a new crack between the basement floor and the cement pad that formed the foundation of the chimney in the basement; (4) new or enlarged cracks radiated out across the basement floor from the chimney foundation; and (5) cracks that had previously existed in the garage floor were noticeably wider and more extensive. The brothers also noticed that a flowerbed retaining wall that helped to support the rear wall of the garage had "moved demonstrably."

[¶ 8] When she returned to Maine, Vera observed the same changes in the condition of the property as her sons had reported and also noted larger or new cracks or separations on the back wall of the home's foundation.

[¶ 9] The Dyers engaged an expert in ground engineering and environmental services, Mark Peterson, who testified at a deposition that the U.S. Bureau of Mines has established a "safe operating envelope" for seismic impact of blasts to minimize property damage. Under these guidelines, a blast is considered unlikely to cosmetically damage fragile structures in a building if its velocity falls below the established envelope. Where, however, a structure is underlain by "uncontrolled fill" as opposed to "engineered fill," [2] damage can potentially result even if blasting is within the Bureau of Mines's envelope. Peterson testified that the Dyer home might be built on top of uncontrolled fill. Assuming this, Peterson stated that "there is not 100% certainty how the [Dyers'] floor would behave" in response to vibrations from blasting, and that settlement of

2. According to Peterson, engineered fill refers to subgrade under a structure's foundation that is layered, compacted, or placed in a way so as "to avoid deformation after it was placed." In contrast, uncontrolled fill is "fill that's from an unknown source of an unknown characteristic and placed in an unknown way"; such fill "can be susceptible to unusual and unanticipated behavior over time for a variety of reasons."

uncontrolled fill could occur as a result of blasting.

[¶ 10] Readings from a seismograph that Maine Drilling placed adjacent to the Dyer residence showed that six blasts produced vibrations that "slightly" exceeded the Bureau of Mines's envelope. According to Peterson's report, seismograph readings showed that blasts in October and November 2004, late March 2005, and early April 2005, produced vibrations in excess of those guidelines. Seismograph readings indicate that the most severe vibration at the Dyer home occurred on November 9, 2004.

[¶ 11] Peterson testified that it is common for Maine homes to have cracking in foundations or basement floors that appear "over the course of the years," which could be caused by such things as vibrations, earth pressure, ground settlement, temperature, and ground water. Peterson opined that settlement under the Dyer home could have taken place for reasons unrelated to Maine Drilling's blasting, but that he would have expected such settlement to have occurred prior to blasting. Conversely, Peterson concluded that settlement due to the blasting was possible because: (1) the Dyers observed changes in floor settlement after blasting; (2) the pre-blast survey and the Dyers' observations did not indicate that the current basement settlement conditions existed before blasting began; (3) uncontrolled fill could consolidate and cause settlement from blasting vibrations; and (4) the most severe vibrations from blasting occurred prior to observations that the basement floor had settled.

[¶ 12] The Dyers filed a three-count complaint, subsequently amended, alleging causes of action in strict liability and negligence. Maine Drilling filed a motion for summary judgment as to all counts in the Dyers' complaint. The Dyers opposed Maine Drilling's motion and filed a statement of additional material facts.

[¶ 13] The court granted Maine Drilling's motion for a summary judgment and awarded costs to Maine Drilling. The court found in favor of Maine Drilling on the Dyers' claim for strict liability, citing *Reynolds v. W.H. Hinman Co.*, 145 Me. 343, 75 A.2d 802 (1950) and other Maine precedent in support of its ruling. As to the Dyers' negligence claim, the court concluded that the record provided evidence to identify a standard or duty of care, based on standards formulated by the Bureau of Mines, and that there remained factual disputes regarding a breach of that standard or duty of care. The court concluded, however, that the record was insufficient to generate a triable claim that Maine Drilling's conduct was a cause of damage to the Dyer home and that the record failed to include an expert opinion that the blasting was a legal cause of the damage. The court also determined that the Dyers could not rely on the doctrine of res ipsa loquitur in this case because the record on summary judgment failed to contain evidence that the alleged damages could not have occurred in the absence of negligence. The Dyers filed this appeal.

## II. DISCUSSION

### A. Standard of Review

[¶ 14] We review a grant of a summary judgment de novo, considering the evidence in the light most favorable to the non-moving party. *Jorgensen*, 2009 ME 42, ¶ 2, 969 A.2d at 914. "We will affirm a grant of summary judgment if the record reflects that there is no genuine issue of material fact and the movant is entitled to a judgment as a matter of law." *Burdzel v. Sobus*, 2000 ME 84, ¶ 6, 750 A.2d 573, 575.

## B. Strict Liability

[¶ 15] Because the Dyers pleaded strict liability, and their claim was dismissed on that count as well as on negligence counts, we address the strict liability issue, and apply that analysis regardless of the validity of the negligence claim. *See Jensen v. S.D. Warren Co.*, 2009 ME 35, ¶ 35, 968 A.2d 528, 537 (addressing issues that could arise on remand depending on resolution of other claims). We adopt today the Second Restatement's imposition of strict liability for abnormally dangerous activities,[3] and remand to the court to determine if the blasting in this case was an abnormally dangerous activity under the Restatement's six-factor test. *See* Restatement (Second) of Torts §§ 519–520 (1977).[4] In doing so, we overrule our prior opinions requiring proof of negligence in blasting cases.

### 1. History of Strict Liability

[¶ 16] Strict liability doctrine originated in the English case *Rylands v. Fletcher*, (1868) 3 L.R. 330 (H.L.), where the court held that a defendant was liable regardless of negligence when he used his land in a way that was non-natural and likely to cause injury, and injury in fact resulted.

*Id.* ("If a person brings, or accumulates, on his land anything which, if it should escape, may cause damage to his neighbour, he does so at his peril. If it does escape, and cause damage, he is responsible, however careful he may have been."). This Court rejected *Rylands* in the 1950s, deciding that proof of negligence would be required in blasting cases. *Reynolds*, 145 Me. at 362, 75 A.2d at 811.

[¶ 17] In *Reynolds*, we noted that strict liability was the historic rule, but that the majority of states had switched to a negligence approach in abnormally dangerous activities cases. *Id.* at 347–48, 75 A.2d at 804–05. Additionally, the opinion quoted a law review article arguing against strict liability based in part on the "difficulty of drawing the line between the danger which calls for care and the extra hazard. There are, as yet[,] no unanimously approved rules or criteria as to this subject." *Id.* at 349, 75 A.2d at 805 (quotation marks omitted). Finally, our *Reynolds* decision was supported by the conclusions that blasting is a reasonable and lawful use of land, *id.* at 361, 75 A.2d at 811, and that plaintiffs would generally be able to recover under a negligence scheme. *Id.* at 351, 75 A.2d at 806 ("At the present time, in an action for

---

3. Other authorities and cases sometimes refer to these activities as "ultra-hazardous" or "extra-hazardous," but we use the term "abnormally dangerous activities," consistent with the Second Restatement.

4. The Second Restatement states:

§ 519. General Principle
(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.
(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.
§ 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:
(a) existence of a high degree of risk of some harm to the person, land or chattels of others;
(b) likelihood that the harm that results from it will be great;
(c) inability to eliminate the risk by the exercise of reasonable care;
(d) extent to which the activity is not a matter of common usage;
(e) inappropriateness of the activity to the place where it is carried on; and
(f) extent to which its value to the community is outweighed by its dangerous attributes.
Restatement (Second) of Torts §§ 519–520 (1977).

blasting, if the courts apply the modern law as to negligence, a plaintiff who has a meritorious case can generally recover without calling in aid the old rule of absolute liability." (quotation marks omitted)).

## 2. Modern Strict Liability

[¶ 18] These rationales have been undermined in the last half-century. Policy approaches have shifted nationwide, leading almost every other state to adopt strict liability in blasting and other abnormally dangerous activity cases, and leading Maine to apply strict liability in other contexts. Additionally, the Second Restatement has provided a scheme of clear criteria for delineating which activities require a strict liability approach. In light of these changes, we overturn *Reynolds* and its progeny and adopt strict liability under the Restatement's six factor test.

[¶ 19] *Reynolds* operated on the assumption that negligence liability would allow most plaintiffs to recover in blasting cases. However, we have recognized that blasting is inherently dangerous, *Maravell v. R.J. Grondin & Sons,* 2007 ME 1, ¶ 17, 914 A.2d 709, 714, and most courts have recognized that this inherent danger cannot be eliminated by the exercise of care. The Dyers' expert testified that blasting may cause damage even when it is within the Bureau of Mines's guidelines. Consequently, although blasting is a lawful and often beneficial activity, the costs should fall on those who benefit from the blasting,

rather than on an unfortunate neighbor. *See* W. Page Keeton, et al., *Prosser & Keeton on Torts* ch. 13 § 78 at 556 (5th ed. 1984) ("[S]uch intentional exposure of another to great danger, however socially desirable the activity, can generally be regarded as a sound basis on which to allocate the risk of loss to the person or entity engaging in that ultra-hazardous and abnormally dangerous activity. This seems to best describe the result of most recent cases.").

[¶ 20] The negligence approach to abnormally dangerous activities initially taken by American courts was rooted in part in the idea that dangerous activities were essential to industrial development, "and it was considered that the interests of those in the vicinity of such enterprises must give way to them, and that too great a burden must not be placed upon them." *Id.* at 549. But today, that attitude has changed, *see id.,* and strict liability seeks to encourage both cost-spreading and incentives for the utmost safety when engaging in dangerous activities. Additionally, blasters are already required by the rules of the Maine Department of Public Safety and by many town ordinances to have liability insurance covering damages that result from blasting.[5] Thus, a strict liability scheme should not greatly increase costs for these businesses.

[¶ 21] At least forty-one states have adopted some form of strict liability for blasting,[6] with only two of those clearly

---

5. The rules require that "[a] certificate of public liability insurance in the amount of $500,000.00 to cover losses, damages or injuries that may ensue to persons or property must be furnished to the Office of State Fire Marshal prior to issuance of a permit to use, store or transport explosives." 9 C.M.R. 16 219 031-2 (2007). Many towns similarly require insurance to obtain a blasting permit, for example Portland requires the submission of proof of insurance, Portland, Me., Code

§ 10–18 (June 19, 2008), as well as Bangor, which requires that "[t]he blaster shall obtain and maintain general liability insurance in an amount to be approved by the City Engineer." Bangor, Me., Code § 76–6 (April 8, 1996).

6. *See Harper v. Regency Dev. Co.,* 399 So.2d 248, 252 (Ala.1981); *Yukon Equip., Inc. v. Fireman's Fund Ins. Co.,* 585 P.2d 1206, 1211 (Alaska 1978); *Correa v. Curbey,* 124 Ariz. 480, 605 P.2d 458, 459–60 (Ct.App.1979); *W. Geophysical Co. v. Mason,* 240 Ark. 767, 402

limiting it to damage caused by debris.[7] The other New England states are among those adopting strict liability, with the exception of New Hampshire, which has retained negligence liability for blasting damages. *See Wadleigh v. Manchester,* 100 N.H. 277, 123 A.2d 831, 833 (1956).

[¶ 22] Massachusetts was one of the first states to adopt the concept, and has consistently applied strict liability to cases involving damage by debris from blasting, although it applies negligence analysis to concussion or vibration damage cases. *See Coughlan v. Grande & Son, Inc.,* 332 Mass. 464, 125 N.E.2d 778, 780 (1955). Vermont has joined the majority of other states, including Connecticut and Rhode Island, and applied strict liability to all

blasting cases, finding that "[i]t seems clear that the just result is to allocate the loss so that those gaining the benefit of the activity bear the cost, if the utility of the activity is great enough to justify the invasion of private rights." *Malloy v. Lane Constr. Corp.,* 123 Vt. 500, 194 A.2d 398, 400 (1963).

[¶ 23] Not only has the weight of authority shifted nationally, but we, acting pursuant to our common law authority, have applied forms of strict liability in certain circumstances. For example, we have adopted the Second Restatement approach to injuries caused by wild animals, analogizing those cases to blasting. *See Byram v. Main,* 523 A.2d 1387, 1390 n. 7 (Me.1987) ("The keeping of wild animals is

S.W.2d 657, 658 (1966); *Balding v. D.B. Stutsman, Inc.,* 246 Cal.App.2d 559, 54 Cal. Rptr. 717, 720 (1966); *Garden of the Gods Village, Inc. v. Hellman,* 133 Colo. 286, 294 P.2d 597, 600 (1956); *Whitman Hotel Corp. v. Elliot & Watrous Eng'g Co.,* 137 Conn. 562, 79 A.2d 591, 595–96 (1951); *Catholic Welfare Guild, Inc. v. Brodney Corp.,* 208 A.2d 301–02 (Del.Super.1964); *Morse v. Hendry Corp.,* 200 So.2d 816, 817 (Fla.Dist.Ct.App.1967); *Brooks v. Ready Mix Concrete Co.,* 94 Ga.App. 791, 96 S.E.2d 213, 215 (1956); *Beckstrom v. Hawaiian Dredging Co.,* 42 Haw. 353, 364–65 (Haw.Terr.1958); *Peet v. Dolese & Shepard Co.,* 41 Ill.App.2d 358, 190 N.E.2d 613, 618 (1963); *Enos Coal Mining Co. v. Schuchart,* 243 Ind. 692, 188 N.E.2d 406, 408 (1963); *Davis v. L & W Constr. Co.,* 176 N.W.2d 223, 225 (Iowa 1970); *Valley Stone Co. v. Binion,* 422 S.W.2d 889, 890 (Ky.Ct.App.1967); *Fontenot v. Magnolia Petroleum Co.,* 227 La. 866, 80 So.2d 845, 849 (1955); *Gallagher v. H.V. Pierhomes, LLC,* 182 Md.App. 94, 957 A.2d 628, 634 (Ct.Spec.App.2008); *Clark–Aiken Co. v. Cromwell–Wright Co.,* 367 Mass. 70, 323 N.E.2d 876, 885 (1975); *Jones v. Al Johnson Constr. Co.,* 211 Minn. 123, 300 N.W. 447, 449 (1941); *Cent. Exploration Co. v. Gray,* 219 Miss. 757, 70 So.2d 33, 37 (1954); *Clay v. Mo. Highway & Transp. Comm'n,* 951 S.W.2d 617, 623 (Mo.Ct.App.1997); *Longtin v. Persell,* 30 Mont. 306, 76 P. 699, 701 (1904); *Berg v. Reaction Motors Div.,* 37 N.J. 396, 181 A.2d 487, 494 (1962); *Thigpen v. Skousen & Hise,*

64 N.M. 290, 327 P.2d 802, 806 (1958); *Spano v. Perini Corp.,* 25 N.Y.2d 11, 302 N.Y.S.2d 527, 250 N.E.2d 31, 33 (1969); *Guilford Realty & Ins. Co. v. Blythe Bros. Co.,* 260 N.C. 69, 131 S.E.2d 900, 904–05 (1963); *Walczesky v. Horvitz Co.,* 26 Ohio St.2d 146, 269 N.E.2d 844, 846 (1971); *Seismograph Serv. Corp. v. Buchanan,* 316 P.2d 185, 187 (Okla.1957); *Bedell v. Goulter,* 199 Or. 344, 261 P.2d 842, 844 (1953); *Federoff v. Harrison Constr. Co.,* 362 Pa. 181, 66 A.2d 817, 817–18 (1949); *Wells v. Knight,* 32 R.I. 432, 80 A. 16, 18–19 (1911); *Wallace v. A.H. Guion & Co.,* 237 S.C. 349, 117 S.E.2d 359, 361 (1960); *Feinberg v. Wis. Granite Co.,* 54 S.D. 643, 224 N.W. 184 (1929); *Oman Constr. Co. v. Tenn. C. Ry. Co.,* 212 Tenn. 556, 370 S.W.2d 563, 575–76 (1963); *Hood v. Laning,* 415 S.W.2d 953, 955–56 (Tex.Civ.App.1967); *Madsen v. E. Jordan Irrigation Co.,* 101 Utah 552, 125 P.2d 794, 794 (1942); *Malloy v. Lane Constr. Co.,* 123 Vt. 500, 194 A.2d 398, 400 (1963); *Laughon & Johnson, Inc. v. Burch,* 222 Va. 200, 278 S.E.2d 856, 859 (1981); *Klein v. Pyrodyne Corp.,* 117 Wash.2d 1, 810 P.2d 917, 920 (1991); *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.,* 152 W.Va. 549, 165 S.E.2d 113, 118 (1968); *Ziegler v. Wonn,* 18 Wis.2d 382, 118 N.W.2d 706, 708 (1963).

7. *See Coughlan v. Grande & Son, Inc.,* 332 Mass. 464, 125 N.E.2d 778, 780 (1955); *Hood v. Laning,* 415 S.W.2d 953, 955–56 (Tex.Civ. App.1967).

categorized with such dangerous activities as blasting, pile driving, storing inflammable liquids, and accumulating sewage."). Owners of domestic animals may be held strictly liable as well. *See Henry v. Brown,* 495 A.2d 324, 325 (Me.1985).

[¶ 24] The Legislature has also been increasingly willing to apply strict liability in certain cases, imposing liability for explosions of natural gas, 14 M.R.S. § 165 (2008); for defective products, 14 M.R.S. § 221 (2008); and for oil spills and hazardous waste, 38 M.R.S. §§ 552(2), 1319–J (2008).

[¶ 25] The Legislature has not, however, addressed the need for strict liability in abnormally dangerous activity cases. Maine Drilling makes the argument that performance standards for blasting at quarries show that the Legislature has addressed the issue of liability for blasting, and that it both did not mention strict liability and declined to extend the high standard of care past quarry operations. But this provision is in a chapter pertaining specifically to quarries, and for the purposes of environmental protection. *See* 38 M.R.S. § 490–Z(14) (2008). Establishing standards in those circumstances does not disallow strict liability in blasting cases, especially in the construction context, which the statute explicitly does not encompass. 38 M.R.S. § 490–X (2008). "[S]trict liability is entirely a question of the relation of the activity to its surroundings," Keeton, *Prosser & Keeton on Torts* § 78 at 554, and because of this quarries require a wholly different analysis than blasting in other areas.

[¶ 26] The concurrence points to 17 M.R.S. § 2791 (2008), which imposes strict liability on all blasters who fail to give warning, or who blast after sunset. Section 2791 does not encompass the situation we face today. This statute, passed in 1852, deals with blasting "lime rock or other rocks," requiring blasters to give seasonable notice so that those approaching stay a safe distance from the explosion. *See id.* There has been no issue in this case involving notice of the blasting. In fact, during many of the blasts, Vera Dyer was away from her residence. We only reach an issue of statutory surplusage if language renders a statute meaningless. *See Stromberg–Carlson Corp. v. State Tax Assessor,* 2001 ME 11, ¶ 9, 765 A.2d 566, 569. This statute does not apply to our situation and therefore our interpretation does not render it meaningless.

[¶ 27] Under these circumstances, the application of strict liability or negligence to blasting "is a creation of our common law.... [I]ts applicability in Maine is controlled entirely by the precedents of this Court. It is therefore appropriate for this Court to continue to determine the scope of [the doctrine]." *See Picher v. Roman Catholic Bishop of Portland,* 2009 ME 67, ¶ 27, 974 A.2d 286, 295 (discussing doctrine of charitable immunity) (quotation marks omitted).

### 3. Stare Decisis

[¶ 28] Although we afford great weight to the value of precedent under the doctrine of stare decisis, "[p]recedents, once so established, ... do not become totally immune from change for all time. Were that to be so ... the law would be locked rigidly to the decisions of the past, rendered powerless to adapt to the needs and values of the present." *Myrick v. James,* 444 A.2d 987, 998 (Me.1982). Where, as here, "the basis on which [a] rule was originally founded has ... fallen into jurisprudential disrepute and is disapproved in the better-considered recent cases and in the authoritative scholarly writings," we must allow that rule to change. *See id.* at 999; *see also Adams v. Buffalo Forge Co.,* 443 A.2d 932, 935 (Me.

1982) ("While we recognize the unquestioned need for the uniformity and certainty the doctrine provides, we have also previously recognized the dangers of a blind application of the doctrine merely to enshrine forever earlier decisions of this court.").

### 4. The Second Restatement

■ [¶ 29] We adopt the Second Restatement's approach to strict liability, imposing liability on defendants conducting an abnormally dangerous activity without requiring proof of negligence, although causation must still be proved. We believe that this approach strikes the right balance of policy interests by considering on a case-by-case basis which activities are encompassed by the rule, and by taking account of the social desirability of the activity at issue, *see* Restatement (Second) of Torts § 520(f) (1977), in contrast to the First Restatement approach, *see* Restatement (First) of Torts § 520 (1939).

[¶ 30] Most jurisdictions have not adopted either the First or Second Restatement, and instead impose strict liability in blasting cases under a blanket rule that a blaster is always liable when causation is established. *See, e.g., Whitman Hotel Corp. v. Elliott & Watrous Eng'g Co.*, 137 Conn. 562, 79 A.2d 591, 595 (1951). However, a number of courts that have reexamined the question since the adoption of the Second Restatement have chosen to apply the Restatement approach to abnormally dangerous activities. *See, e.g., Harper v. Regency Dev. Co.*, 399 So.2d 248, 252–53 (Ala.1981); *Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138, 140–42 (1969) (applying draft Second Restatement); *Clark–Aiken Co. v. Cromwell–Wright Co.*, 367 Mass. 70, 323 N.E.2d 876, 886–877 (1975) (applying draft Second Restatement); *Valentine v. Pioneer Chlor Alkali Co.*, 109 Nev. 1107, 864 P.2d 295, 297

(1993); *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222, 234 (1991); *Selwyn v. Ward*, 879 A.2d 882, 889 (R.I.2005); *Klein v. Pyrodyne Corp.*, 117 Wash.2d 1, 810 P.2d 917, 920 (1991); *Crum v. Equity Inns, Inc.*, 685 S.E.2d 219, 231, 2009 W. Va. Lexis 69, at *33 (W. Va. June 22, 2009). Massachusetts is one such jurisdiction, adopting the Second Restatement because it "advocates considering the activity in light of surrounding circumstances on the facts of each case. This, in essence, shifts consideration from the nature of the activity to the nature and extent of the risk." *Clark–Aiken Co.*, 323 N.E.2d at 887.

[¶ 31] A person who creates a substantial risk of severe harm to others while acting for his own gain should bear the costs of that activity. Most of the courts of the nation have recognized this policy, and we now do as well. For these reasons we adopt strict liability and remand for a determination whether the activity in this case subjected Maine Drilling to liability under the Second Restatement approach.

### C. Causation

■ [¶ 32] Under a strict liability analysis, proof of a causal relationship between the blasting and the property damage is still required. *See* Restatement (Second) of Torts § 519(1) (1977). The Dyers therefore must demonstrate an issue of material fact as to causation to maintain either their strict liability or negligence claims. The question of causation is generally one of fact to be determined by the fact-finder, and "a judgment as a matter of law is improper if any reasonable view of the evidence could sustain a finding of proximate cause." *Houde v. Millett*, 2001 ME 183, ¶ 11, 787 A.2d 757, 759.

[¶ 33] Viewing the evidence in a light most favorable to the Dyers, and drawing

all reasonable inferences in their favor, the Dyers produced sufficient evidence on the issue of causation to survive Maine Drilling's motion for summary judgment. First, the record has significant evidence concerning the condition of the premises before blasting began. The Dyer family was exceedingly familiar with the condition of the home prior to blasting, having lived in it for over fifty years. Immediately preceding blasting activities, Maine Drilling (or its agent) completed a pre-blasting survey of the condition of the home and recorded its findings. Richard Dyer likewise inspected and videotaped the pre-blast condition of the home.

[¶ 34] The record also contains evidence that six blasts exceeded the Bureau of Mines's threshold, and that Vera felt the "whole house shake" from at least two blasts, a sensation she did not feel from the passing of heavy equipment in the area. After these blasts occurred, Paul and Richard observed in early 2005 significant changes to the condition of the home when compared to its condition immediately before blasting began. Upon returning from Florida, Vera corroborated the changes observed by her sons.

[¶ 35] A fact-finder could infer that these significant changes, observed over a short period of time in a home over seventy-years-old, were not likely to have been caused by normal settling. In *Cratty*, we held that expert testimony is not necessary to prove negligence, including causation, in a blasting damages case. *Cratty v. Samuel Aceto & Co.*, 151 Me. 126, 131, 116 A.2d 623, 626 (1955).

[¶ 36] In addition to their personal observations, the Dyers offered evidence through their expert that, given all the circumstances in the case, it was possible that blasting caused settlement and the damage observed in the home and garage. Additionally, the expert opined that although forces other than blasting could have caused the damages, such damage typically occurs over a course of years, as opposed to a period of months.

[¶ 37] A fact-finder could reasonably find that the blasting was the proximate cause of damage to the Dyer home, because of: (1) the condition of the home observed before and after blasting commenced; (2) the temporal relationship between when the strongest blasting vibrations occurred and when damage was first observed; (3) evidence that the damage could have been caused by blasting; and (4) the reasonable inference that such damage was unlikely to be caused by other forces that typically cause cracking over longer periods of time. Accordingly, the Dyers have provided sufficient evidence to create a genuine issue of material fact, precluding a summary judgment in Maine Drilling's favor on the causation issue incident to both the strict liability and the negligence claims.

## D. Res Ipsa Loquitur

[¶ 38] The Dyers argue that the doctrine of res ipsa loquitur applies to establish negligence as a matter of law in this case. Although the court may not need to reach the Dyers' negligence claims given our holdings regarding strict liability and causation, we hold that the doctrine does not apply to blasting cases.

[¶ 39] Res ipsa applies where "the damage is such that it would not ordinarily have occurred if the user of the dangerous instrumentality had the required knowledge, and proper care had been exercised in its use." *Cratty*, 151 Me. at 133, 116 A.2d at 627. Although *Cratty* applied the doctrine in a blasting case, we have since recognized that blasting is "inherently dangerous." *See Maravell*, 2007 ME 1, ¶ 17, 914 A.2d at 714.

Because of this, blasting is not an activity where a fact-finder can "infer negligence and causation from the mere occurrence of an event." *See Poulin v. Aquaboggan Waterslide*, 567 A.2d 925, 926 (Me.1989).

[¶ 40] According to the Dyers' expert, even blasting that is within the guidelines set by the U.S. Bureau of Mines can cause damage, particularly to structures underlain by uncontrolled fill. This is like other cases in which we have declined to apply the res ipsa doctrine because the instrumentality causing the harm could have been set off by a number of factors that do not involve negligence. *See, e.g., Wellington Assocs., Inc. v. Capital Fire Prot. Co.*, 594 A.2d 1089, 1092 (Me.1991) (bursting pipe); *Parker v. Harriman*, 516 A.2d 549, 551 (Me.1986) (collapse of vehicle jack); *Pratt v. Freese's, Inc.*, 438 A.2d 901, 904 (Me.1981) (elevator door malfunction). Because even careful blasting may cause dangerous vibrations, the Dyers may not rely on the doctrine of res ipsa loquitur in this case.

The entry is:

Judgment vacated. Remanded for further proceedings consistent with this opinion.

ALEXANDER, J., with whom SAUFLEY, C.J., joins, concurring in part and dissenting in part.

[¶ 41] I concur in the result of the Court's carefully written and well-researched opinion vacating the trial court's judgment. I do not join the Court's opinion because, in my view, the Dyers may recover if they can prove causation under existing Maine law. Therefore, we should have no occasion to ignore the doctrine of stare decisis and cast aside existing law to (1) create a common law rule of strict liability when blasting damages are alleged, and (2) overrule prevailing precedent that already allows recovery of damages if negligence and causation can be demonstrated in a blasting case. I respectfully dissent from the Court's expansion of the current, limited statutory rule of strict liability for blasting cases stated in 17 M.R.S. § 2791 (2009).[8]

[¶ 42] As the Court's opinion states, the record on summary judgment must be reviewed in the light most favorable to the non-prevailing party, here the Dyers. *See Jorgensen v. Dep't of Transp.*, 2009 ME 42, ¶ 2, 969 A.2d 912, 914. The Court's opinion accurately states the facts of this case, viewed in that light. Thus the facts are not repeated here.

[¶ 43] We have a prior opinion, *Cratty v. Samuel Aceto & Co.*, 151 Me. 126, 116 A.2d 623 (1955), that is virtually on all fours with the facts and issues in this case. In *Cratty*, as here, damage to a home was observed following blasting activity. In *Cratty*, we declined the plaintiff's invitation to adopt a rule of strict liability for blasting cases. However, we allowed the plaintiff to proceed on negligence and res ipsa loquitur theories of recovery. 151 Me. at 130–35, 116 A.2d at 626–28.

[¶ 44] There are minor differences between *Cratty* and this case. In *Cratty*, the blasting occurred as close as 200 feet from the home. Here it occurred as close as 100 feet from the home. In *Cratty*, there was no evidence of any standards to measure risk. Here there is evidence of the

---

8. Title 17 M.R.S. § 2791 (2008) states that when a person engaged in blasting fails to "give seasonable notice thereof, so that all persons or teams approaching shall have time to retire to a safe distance" or detonates an explosion after sunset, the person violating the notice mandate or the after sunset detonation prohibition, "is liable for all damages caused by any explosion." Neither notice nor after sunset explosions are at issue in this case.

Bureau of Mines risk standards and evidence of violation of those standards in at least six blasts. Thus, under our existing law, the instant case may be more favorable to the plaintiffs than the case stated in *Cratty,* and we should permit the Dyers to proceed with their claim in accordance with the law that has governed such cases since *Cratty.*

## A. Stare Decisis

[¶ 45] Stare decisis, the practice of appellate courts respecting their own past precedent in interpreting the law, and applying that precedent in the present to resolve similar questions of law, is a staple of appellate decision-making. "*Stare decisis* embodies the important social policy of continuity in the law by providing for consistency and uniformity of decisions." *Bourgeois v. Great N. Nekoosa Corp.,* 1999 ME 10, ¶ 5, 722 A.2d 369, 371.

[¶ 46] Stare decisis helps to assure that an appellate judge's view that a prior decision may have been wrongly decided is, standing alone, insufficient to justify overruling the decision. *See Alexandre v. State,* 2007 ME 106, ¶ 35, 927 A.2d 1155, 1164. Appellate courts proceed with great care before overruling a prior decision, and do so only after careful analysis and based on a compelling reason. *Id.* "We do not disturb a settled point of law unless the prevailing precedent lacks vitality and the capacity to serve the interests of justice." *Bourgeois,* ¶ 5, 722 A.2d at 371, citing *Myrick v. James,* 444 A.2d 987, 1000 (Me. 1982) (quotation marks omitted).

[¶ 47] As discussed below, our prevailing precedent is viable and serves the interests of justice, providing grounds upon which the Dyers may recover if they can prove their claim. There is no need to disturb settled points of law to extend the doctrine of strict liability to blasting activities.

## B. Negligence

[¶ 48] We have held that a prima facie case of negligence to avoid summary judgment requires that a plaintiff must establish four elements: (1) a duty or standard of care; (2) breach of that duty or standard of care; (3) an injury to the plaintiff caused by that breach of duty or standard of care; and (4) damages. *Mastriano v. Blyer,* 2001 ME 134, ¶ 11, 779 A.2d 951, 954.

[¶ 49] Here the trial court has already determined that there is sufficient evidence to avoid summary judgment on the standard of care and breach of the standard of care issues. Thus, the only dispute for resolution on this appeal is whether there remain disputed facts relating to the issue of causation. The Court holds, and I agree, that the Dyers have produced sufficient evidence to survive Maine Drilling's motion for summary judgment on the causation issue incident to their negligence claim. *See Cratty,* 151 Me. at 131–35, 116 A.2d at 626–28. Thus, based on the Court's reasoning, and with the trial court having found fact disputes regarding the standard of care and breach of the standard of care, the Dyers' negligence claim may proceed to trial.

[¶ 50] Further, it is important to remember that *Cratty* has already established that expert testimony is not necessary to prove negligence, including causation, in a blasting damages case. 151 Me. at 131, 116 A.2d at 627 ("It is nevertheless rare that damage is caused to adjoining property, if the blaster uses reasonable care that the law requires that he should use. This is common knowledge to every school boy and to

every adult citizen.").[9]

[¶ 51]   Given the conclusion that there is sufficient record evidence as to each element of negligence to withstand Maine Drilling's motion for summary judgment, neither we nor the trial court, on remand, need to consider application of the doctrine of res ipsa loquitur. *See Sheltra v. Rochefort,* 667 A.2d 868, 870 (Me.1995); *Poulin v. Aquaboggan Waterslide,* 567 A.2d 925, 926 (Me.1989).[10]

## C.   Strict Liability

[¶ 52]   In *Cratty,* confirming our prior holding in *Reynolds v. W.H. Hinman Co.,* 145 Me. 343, 361–62, 75 A.2d 802, 811 (1950), we held that there is no common law strict liability for damages observed after blasting and that to recover damages, negligence on the part of the blaster must be alleged and proved.   151 Me. at 130, 116 A.2d at 626.   We should decline to overrule *Cratty* and adopt a rule of strict

liability in blasting cases at this time. Such a change in the law is not required to permit the Dyers' claim to be heard.

[¶ 53]   The Legislature has already enacted a law establishing strict liability in blasting cases in certain, very limited, circumstances.   That law, 17 M.R.S. § 2791, states that when a person engaged in blasting fails to "give seasonable notice thereof, so that all persons or teams approaching shall have time to retire to a safe distance," or detonates an explosion after sunset, the person violating the notice mandate or the after sunset detonation prohibition "is liable for all damages caused by any explosion."   The Court's action today, expanding strict liability from this limited area to all blasting activity, renders section 2791 unnecessary statutory surplusage.   Our rules of statutory construction direct that, when possible, we should not construe statutes—or the common law—to render statutory language

---

9. *See generally* M.R. Evid. 702; *Maravell v. R.J. Grondin & Sons,* 2007 ME 1, ¶ 11, 914 A.2d 709, 713 (stating that expert testimony may not be necessary "where the negligence and harmful results are sufficiently obvious as to lie within common knowledge"); *see also Albison v. Robbins & White, Inc.,* 151 Me. 114, 124–25, 116 A.2d 608, 613 (1955).

Courts in other jurisdictions have concluded that causation may be shown, or that the plaintiff may survive a summary judgment motion, based on the observations of a layperson. *See, e.g., Birmingham Coal & Coke Co. v. Johnson,* 10 So.3d 993, 997–98 (Ala. 2008) (affirming award of damages in blasting case where plaintiffs presented evidence of feeling vibrations in the house and damage after blasting, but did not present expert testimony on causation); *King v. New Haven Trap Rock Co.,* 146 Conn. 482, 152 A.2d 503, 504 (1959) (holding that expert testimony was not required to prove causation and damage in that blasting concussion case); *McCuller v. Drummond Co.,* 714 So.2d 298, 299 (Ala.Civ. App.1997) (holding that the defendant was not entitled to a summary judgment when the plaintiff provided evidence concerning causa-

tion that the home was damaged after blasting in a manner consistent with blasting damage, but did not provide testimony as to causation from a blasting expert).

10.   Res ipsa loquitur may apply only when a plaintiff proves by a preponderance of the evidence that: (1) an injury or damage to the plaintiff was caused by an unexplained event; (2) at the time of the damage, the instrument causing the damage was under the defendant's control or management; (3) in the ordinary course of events, the damage would not have occurred in the absence of negligence; and (4) other potential causes of the damage, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence. *See Sheltra v. Rochefort,* 667 A.2d 868, 870 (Me.1995); *Poulin v. Aquaboggan Waterslide,* 567 A.2d 925, 926 (Me.1989). Here, the Dyers allege that blasting activity, done in violation of Bureau of Mines standards, is the cause of their damages.   With causation alleged to be based on an explained event, and a standard of care identified and alleged to have been violated, there is no occasion to consider a res ipsa loquitur theory of recovery.

surplusage or meaningless. *Stromberg–Carlson Corp. v. State Tax Assessor*, 2001 ME 11, ¶ 9, 765 A.2d 566, 569; *Finks v. Me. State Highway Comm'n*, 328 A.2d 791, 799. We should leave it to the Legislature, as a matter of policy, to determine whether or not to adopt an expanded rule of strict liability for all cases of damage caused by blasting.

[¶ 54] With the guidance provided by *Cratty* on blasting claims and our more recent cases on negligence and causation issues, we should leave resolution of this claim to the trial court, based on our existing body of law. We should not overrule *Cratty* and create a new common law rule of strict liability, avoiding any need to demonstrate negligence in any blasting case.

SAUFLEY, C.J., concurring in part and dissenting in part.

[¶ 55] I join Justice Alexander's dissent. Although I concur in the Court's decision affirming the judgment on the issue of res ipsa loquitur and vacating the judgment on the issue of negligence, I write additionally in dissent regarding the Court's adoption of a strict liability cause of action in this case.

[¶ 56] Strict liability allows the imposition of economic damages without proof of wrongdoing. *Reynolds v. W.H. Hinman Co.*, 145 Me. 343, 347–48, 75 A.2d 802, 804 (1950). In the 1950s, we held that strict liability does not apply in blasting cases. *See id.* at 361–62, 75 A.2d at 811; *Cratty v.*

*Samuel Aceto & Co.*, 151 Me. 126, 130, 116 A.2d 623, 626 (1955). Thus, for more than fifty years, it has been the settled expectation of businesses and insurers that blasters must act reasonably to protect local property, and that they will be held responsible if they are negligent. Today, by eliminating a plaintiff's burden of proving negligence, the Court expands the financial responsibility of developers who must engage in blasting. The expansion of fiscal responsibility to cases where there has been *no wrongdoing* changes a long-established financial business equation.

[¶ 57] Unfortunately, the Court exercises its authority to expand liability without any factual demonstration of the need for such change or the potential effect on Maine's economy. Without a record containing this important information, the Court risks increasing the costs of doing business (typically insurance costs) and decreasing employment opportunities in Maine.

[¶ 58] As a matter of jurisprudential policy, this is the wrong approach at the wrong time.

[¶ 59] Accordingly, I join Justice Alexander's dissent on the issue of strict liability.