MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2017 ME 67
Docket:       BCD-16-47
Argued:       November 8, 2016
Decided:      April 11, 2017

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HUMPHREY, JJ.
Majority:     SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, and HUMPHREY, JJ.
Dissent:      JABAR, J.

JOHN F. MURPHY HOMES, INC.

v.

STATE OF MAINE

ALEXANDER, J.

[¶1]   John F. Murphy Homes, Inc. (Murphy Homes), appeals from a

judgment entered in the Business and Consumer Docket (*Horton, J.*) granting

summary judgment in favor of the State on John F. Murphy Homes's complaint

seeking recovery on the grounds of breach of contract, quantum meruit, and

equitable estoppel, among other equitable remedies.[1]   We affirm the

judgment.  Because the breach of contract and quantum meruit claims are not

legally viable, we focus our analysis on the equitable estoppel issue.

---

[1]  The complaint does not state separate counts or causes of action: "[Murphy Homes] is legally and equitably entitled to be paid . . . under multiple alternative remedial approaches, including but not necessarily limited to accounting, restitution and damages."  In an earlier order denying the State's motion to dismiss, the trial court limited Murphy Homes to pursuing "the following legal theories and no others: breach of contract; quantum meruit; unjust enrichment; and violation of the federal and state statutes and rules alleged to require the State to pay state matching funds or 'seed[.]'"  The trial court's order appealed from also viewed Murphy Homes's complaint as pursuing an equitable estoppel claim.

## I. CASE HISTORY

[¶2]  The following facts are derived from the parties' statements of material fact, viewed in the light most favorable to John F. Murphy Homes, Inc., the nonprevailing party.  *Estate of Smith v. Cumberland Cty.*, 2013 ME 13, ¶ 2, 60 A.3d 759.

[¶3]  Murphy Homes operates a Special Purpose Private School.  The services it offers to its students, which are either medical or educational, are paid generally in two ways.  For the medical services it provides, Murphy Homes bills MaineCare directly.  MaineCare is the State Medicaid program, administered by the Department of Health and Human Services (DHHS).  *See* 22 M.R.S. § 3173 (2016).  It is funded by the State and federal governments: the federal government covers two-thirds of costs, and the State pays one-third.  The State's one-third contribution to MaineCare is commonly referred to as the "Seed" because the federal government's obligation to pay originates with the State's promise to cover one-third of the costs.  The rate at which Murphy Homes may bill for the medical services it provides is established by MaineCare regulations stated in the MaineCare Benefits Manual.

[¶4]  During the time at issue, Murphy Homes executed at least three provider agreements with MaineCare: in 1998, in 2001, and in 2009.  Each of the agreements contains provisions requiring Murphy Homes to comply with all relevant state and federal laws, including regulations contained in the MaineCare Benefits Manual.  In accordance with procedures outlined in the Manual, Murphy Homes was to submit claims for payment to DHHS concerning the medical services it provided.

[¶5]  Under the federal Medicaid program, DHHS reimbursed providers for approximately one-third of their eligible costs, and the federal government was to pay, through DHHS, the remaining two-thirds.  Pursuant to the Manual, after Murphy Homes submitted a claim, DHHS would send Murphy Homes a remittance form indicating the amount billed during that billing cycle, the "allowed" portion of the amount billed, and the amount DHHS was actually paying.  If Murphy Homes believed that it was underpaid on any given claim, it was required to invoke, within 120 days, the review procedures specified in the Manual.  *See* 14 C.M.R. 10 144 101-I-20, § 1.12 (2014).

[¶6]  For the educational services it provided, Murphy Homes charged tuition to the entity that referred the child to its programs—either the public school district, the child's parents, or the Department of Education.  The Maine

4

Department of Education (DOE) set Murphy Homes's yearly tuition rate based on the Cost Accounting and Rate Establishment System (CARES) report Murphy Homes submitted each year. In each CARES report, Murphy Homes was to document its costs in providing educational services for that year.

[¶7] Sometime in 2001, Murphy Homes's Chief Financial Officer (CFO) received and reviewed Murphy Homes's first payment and remittance form for medical expenses from DHHS. The CFO noticed that Murphy Homes was being paid an amount less than the amount denoted as "allowed" on the form. The CFO called DHHS to inquire about the discrepancy, and was informed by a DHHS employee that the difference between the amount "allowed" and the lower amount actually paid was the Seed, or the State's portion of MaineCare funding. The DHHS employee indicated that the Seed was not to be paid by DHHS, but rather it was "in the tuition." Although the costs at issue were for medical services rather than educational services, the CFO believed what the DHHS employee told him.

[¶8] In the summer of 2002, the CFO spoke with the DOE employee responsible for calculating tuition rates, who confirmed that Seed payments representing the State's share of the allowed medical expenses were added to the tuition rates set by DOE for educational expenses. The record does not

suggest that, after those few conversations with DHHS and DOE employees, there were any further conversations with State employees about payment amounts for nearly a decade, until 2011. During all of this time, Murphy Homes continued to receive payments and payment documentation that demonstrated on the face of the documents that Murphy Homes was receiving payments in amounts less than Murphy Homes believed it was entitled to receive.

[¶9] Because the CFO believed that the Seed payments were already included in DOE tuition calculations, he did not include the Seed amount in the CARES forms he submitted to DOE for educational expenses. Despite his decision to omit the Seed information from CARES reports, the CFO believed that the Seed was being paid by DOE in part because Murphy Homes was approved for tuition rates for educational expenses that were higher than the operating costs it submitted on the CARES forms.

[¶10] Although the tuition rates calculated by DOE were higher than Murphy Homes's educational operating costs, the rates were never high enough to cover both the Seed and the educational operating costs. The CFO believed that this discrepancy was the result of DOE including the entire Seed amount in the tuition rates but approving less than Murphy Homes's total

annual educational costs. Despite noting the underpayments apparent on the remittance forms, Murphy Homes never invoked the 120-day administrative review procedure.

[¶11] In reality, the State had not been paying the Medicaid Seed. At some point in 2011, the State, through DHHS, advised Murphy Homes that it would begin to pay "the full rate." The State's announcement regarding full payment prompted Murphy Homes's officials to investigate its history of reimbursement under the MaineCare program. This investigation led Murphy Homes's staff to conclude that there was "no way [Seed] could have been part of the tuition."

[¶12] On April 12, 2013, Murphy Homes filed a complaint with the Superior Court that was subsequently transferred to the Business and Consumer Docket. Murphy Homes's complaint, as construed by the trial court, stated claims for breach of contract, quantum meruit, and an equitable claim for unjust enrichment or equitable estoppel. *See* Fn. 1. Murphy Homes alleges that it is owed approximately $7.5 million for Seed payments not paid between 2001 and 2011.

[¶13] After a period of discovery, the State moved for summary judgment on all claims. The trial court granted the State's motion, concluding

that Murphy Homes's claims for breach of contract were barred because it failed to properly invoke the payment review process provided in the MaineCare regulations. Further, the court determined that Murphy Homes could not utilize equitable estoppel to prevent the State from relying on the 120-day deadline provided in the Manual, because Murphy Homes's reliance on the statements of State employees that the Seed payments were included in tuition rates for educational expenses was unreasonable as a matter of law. Finally, the court dismissed Murphy Homes's remaining claims for unjust enrichment and quantum meruit, concluding that the claims were barred pursuant to the doctrine of sovereign immunity. Murphy Homes timely appealed. *See* M.R. App. P. 2(b).

## II. LEGAL ANALYSIS

A.    Contract and Quantum Meruit Claims

[¶14]    Compliance with the terms of a contract is, as the trial court determined, a predicate for a breach of contract claim. The MaineCare Benefits Manual, incorporated in Murphy Homes's provider agreements, establishes the terms of the contract between DHHS and Murphy Homes. The regulations governing the MaineCare program are codified in 14 C.M.R. 10 144 101, ch. 101. The regulations cover various aspects of the

8

program-provider relationship, including conflicts surrounding payment. Section 1.12 provides that in the event of a perceived underpayment, the aggrieved provider must request a review within 120 days, or claims are waived:

> If a provider believes an underpayment has been made for covered services rendered, based upon policy and procedures as described in this Manual, the provider should accept and cash the check issued for the services provided. The provider must request a review of payments, using the MaineCare Adjustment Request form, within one hundred and twenty (120) days of the remittance statement date or waive any right to a review of that payment.

14 C.M.R. 10 144 101-I-20, § 1.12 (2014).

[¶15]  Here, Murphy Homes failed to properly invoke the payment review process provided in the MaineCare regulations.  As the trial court accurately held, "the State's contractual duty to pay does not extend to claims not presented in that manner."  Based on that reasoning, the trial court properly determined that Murphy Homes's contract claim failed.

[¶16]  Absent legislative authorization waiving sovereign immunity, an action to recover money from the State is barred by sovereign immunity, *see Drake v. Smith*, 390 A.2d 541, 543 (Me. 1978).  Although the State may waive sovereign immunity and be sued when it enters into a contract pursuant to a statute granting it authority to do so, *id*., this waiver is limited to

actions arising out of a breach of that contract, and not alternative theories of recovery such as quantum meruit—also called "quasi contract" or "implied contract," *see id.* at 545-46.  *See also Runnels v. Quinn*, 2006 ME 7, ¶ 10, 890 A.2d 713 (quantum meruit as "implied contract"); *Danforth v. Ruotolo*, 650 A.2d 1334, 1335 & n.2 (Me. 1994) (quantum meruit as "quasi contract"). Exceptions to sovereign immunity are strictly construed, with immunity the rule and any exceptions narrowly interpreted.  *See New Orleans Tanker Corp. v. Dep't of Transp.*, 1999 ME 67, ¶ 5, 728 A.2d 673; *Lovejoy v. State*, 544 A.2d 750, 751 (Me. 1988).  The trial court properly determined that the quantum meruit claim was barred by sovereign immunity.

B.    Equitable Estoppel

[¶17]   The undisputed facts establish that the MaineCare Benefits Manual requires that any provider disputing amounts received as reimbursement from the State seek administrative review of those disputes within 120 days after the date of the questioned remittance statement is received from the State.  Here, the discrepancies between amounts claimed to be due and amounts paid first occurred during fiscal year 2001—between July 1, 2000, and June 30, 2001.  The discrepancies in payments continued for

over ten years until reimbursement practices were changed by DHHS sometime during fiscal year 2011—between July 1, 2010, and June 30, 2011.

[¶18] During this period, the CFO of Murphy Homes recognized that "Seed" funds were not being paid by DHHS, but, based on a few conversations with state employees, did not include the unpaid Seed amounts in Murphy Homes's CARES reports filed with the State "for most, if not all, of the approximately ten years at issue." The record also establishes, without dispute as to material fact, that the payment discrepancies between amounts billed and amounts paid were reflected in remittance statements sent to Murphy Homes by the State, and that, as the trial court observed, "it was obvious throughout the years in question that [Murphy Homes] was not being paid Seed."

[¶19] At no time during that ten-fiscal-year period did Murphy Homes invoke the established administrative review process after receiving remittance statements that, on their face, demonstrated that the so-called "Seed" was not being paid. Rather than invoke the established administrative review process, Murphy Homes sat on its hands for nearly thirteen years before filing suit on April 12, 2013.

[¶20]  In these circumstances, application of the doctrine of equitable estoppel to allow Murphy Homes to attempt to recover the $7.5 million that it now claims it was underpaid is particularly inappropriate.[2]  Beyond ignoring the 120-day review requirement throughout the ten years of underpayments, $3.7 million of the sum that Murphy Homes now seeks to recover would have been paid in the seven years before April 12, 2007, outside of the six-year statute of limitations, 14 M.R.S. § 752 (2016), that limits equitable, tort, or contract actions.

[¶21]  "At common law, it was held that equitable estoppel could never be applied against any governmental official or agency acting in the discharge of any governmental function."  *City of Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990); *accord Me. Sch. Admin. Dist. No. 15 v. Raynolds*, 413 A.2d 523, 533 (Me. 1980).  In *Desgrosseilliers* and *Raynolds*, we moved away from an absolute prohibition of the application of equitable estoppel to actions by governmental entities, instead holding that equitable estoppel may be applied to governmental agencies "depending on the totality of the particular circumstances involved," with the circumstances including the

---

[2] According to the complaint and other documents in the record, the actual amount in dispute is $7,475,277.  The trial court indicated that the difference between what Murphy Homes billed and what it was paid was $4.6 million from April 10, 2007, through March 31, 2011, and $3.7 million from fiscal year 2001 to April 10, 2007, a total of $8.3 million.  This opinion will use the $7.5 million figure.

nature of the particular governmental official or agency acting, the government function being discharged, and appropriate considerations regarding public policy. *Raynolds*, 413 A.2d at 533; *accord Desgrosseilliers*, 578 A.2d at 714.

[¶22] Summary judgment, although characterized as entitlement to judgment as a matter of law, may be granted in actions involving claims for equitable relief, such as Murphy Homes's equitable estoppel claim, when "(1) there is no genuine issue of material fact affecting either the equitable claims or the equities to be considered in deciding to take action, and (2) the opponent of the motion has been afforded sufficient opportunity to present affidavits or other sworn evidence and legal arguments." *Hutz v. Alden,* 2011 ME 27, ¶ 11, 12 A.3d 1174; *Univ. of Me. Found. v. Fleet Bank of Me.,* 2003 ME 20, ¶ 20, 817 A.2d 871; *see also Town of Falmouth v. Long*, 578 A.2d 1168, 1171 (Me. 1990). Thus, a summary judgment in an action in equity will be reviewed in the light most favorable to the losing party to determine whether the record supports the trial court's decision that there was no genuine issue of material fact and that the trial court did not abuse its discretion in granting or denying the equitable relief requested by the moving party. *See Hutz*, 2011 ME 27, ¶ 12, 12 A.3d 1174.

[¶23]  To prevail on an equitable estoppel claim against a government entity, the proponent of the claim must demonstrate by "clear and satisfactory" evidence that (1) the statements or conduct of a governmental official or agency induced the party to act, or here, to fail to act; (2) the reliance was detrimental to the party; and (3) the reliance was reasonable. *Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630.

[¶24]  Here, the trial court properly rejected the equitable estoppel claim because Murphy Homes's reliance on isolated statements by two state employees more than a decade before the action was initiated, when alleged underpayments were apparent in documentation regularly received and reviewed over the course of the decade, was unreasonable as a matter of law. In particular, Murphy Homes's dependence on those statements as a basis for its decision not to invoke the 120-day review process was insufficient as a matter of law to meet the "clear and satisfactory" evidence standard for generating a trial-worthy issue of fact on the reliance element of its equitable estoppel claim.  *See id.* (quoting *Dep't of Human Servs. v. Bell*, 1998 ME 123, ¶ 8, 711 A.2d 1292).  The State was therefore entitled to a summary judgment. *See* M.R. Civ. P. 56(c).

14

The entry is:

Judgment affirmed.

---

JABAR, J., concurring in part and dissenting in part.

[¶25]   I respectfully dissent because I believe that John F. Murphy Homes has raised a disputed issue of material fact with regard to its equitable estoppel defense, and therefore I would vacate and remand for a trial on the merits.[3]

## I. STANDARD OF REVIEW

[¶26]   Because this case involves a grant of summary judgment, we must conduct a de novo review, considering the evidence and all reasonable inferences drawn therefrom in favor of the nonprevailing party, which, in this case is Murphy Homes.  *See Lever v. Acadia Hosp. Corp.*, 2004 ME 35, ¶ 2, 845 A.2d 1178.

---

[3]   Although I concur with the Court's conclusion that Murphy Homes's quantum meruit claims are barred under the doctrine of sovereign immunity, *see* Court's opinion ¶ 16, I do not agree with its assertion that "[a]bsent legislative authorization waiving sovereign immunity, an action to recover money from the State is barred by sovereign immunity." *Id.*  Since deciding *Drake*, the case upon which the Court relies in stating this proposition, we have decided a number of cases in which we have established that "[o]ur jurisprudence suggests that a general statute allowing the State to enter into contracts implies a waiver of sovereign immunity by the Legislature when the State is sued for breach of that contract." *Knowlton v. Attorney General*, 2009 ME 79, ¶ 13, 976 A.2d 973 (quotations omitted); *see also Profit Recovery Group, USA, Inc. v. Comm'r, Dep't of Admin. & Fin. Servs.*, 2005 ME 58, ¶ 28, 871 A.2d 1237.

[¶27]  The Court's opinion here makes various references to the trial court's decision and draws numerous inferences unfavorable to Murphy Homes.  *See* Court's Opinion ¶¶ 18, 24 (noting that the trial court found that "it was obvious throughout the years" that Murphy Homes was not being paid Seed and "sat on its hands," and concluding that "the trial court properly rejected the equitable estoppel claim") (quotation marks omitted).

[¶28]  This language indicates that the Court is applying the deferential standard of review we use when reviewing the findings of a fact-finder for clear error, and not one we utilize when conducting a de novo review. *See, e.g., St. Louis v. Wilkinson Law Offices, P.C.*, 2012 ME 116, ¶¶ 15-16, 55 A.3d 443 (stating that in an appeal of a judgment entered pursuant to M.R. Civ. P. 50(d), this Court applies a clear error standard of review, which requires a plaintiff to "demonstrate that a contrary finding is compelled by the evidence"); *Aldus v. State*, 2000 ME 47, ¶¶ 14, 19, 748 A.2d 463; *Gravison v. Fisher*, 2016 ME 35, ¶ 31, 134 A.3d 857.

[¶29]  I also believe that the Court improperly relied on *Pelletier* to impose an inappropriate evidentiary standard of proof, "clear and

16

satisfactory" evidence.[4]  *See* Court's Opinion ¶ 24.  The *Pelletier* Court limited the application of the "clear and satisfactory" standard to cases where an equitable estoppel claim is based on the governmental actor's *silence*. *See Dep't of Health & Human Servs. v. Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630.  In *Department of Human Services v. Bell*, the case upon which the *Pelletier* Court relied, we similarly limited the application of this standard to only those cases where a party relies on the government's *inaction*. 1998 ME 123, ¶ 8, 711 A.2d 1292 ("Equitable estoppel based on a [party's] silence will only be applied when it is shown by clear and satisfactory proof that the [party] was silent when he had a duty to speak." (quotation marks omitted)).

[¶30]  This is not a case in which the plaintiff has relied on government inaction.  Rather, this case involves Murphy Homes's reliance on the State's continuous and systematic affirmative conduct over the course of multiple years.  We should not expand the "clear and convincing" standard of proof for the first time to cases involving the statements and actions of governmental officials, rather than their mere silence.

---

[4]  We should stop using the phrase "clear and satisfactory" because, as we noted in *Littlefield v. Adler*, "Clear and satisfactory proof means clear and convincing proof."  676 A.2d 940, 942 (Me. 1996).  The use of this phrase here serves only to add confusion to our jurisprudence.

[¶31]  In addition to disagreeing with the Court's standard of review as applied to the facts of the State's conduct, I also believe that Murphy Homes has presented sufficient facts to raise a dispute of material fact related to its claim of equitable estoppel.

## II.  EQUITABLE ESTOPPEL

[¶32]  Murphy Homes is raising the doctrine of equitable estoppel to prevent the State from asserting as an affirmative defense Murphy Homes's failure to timely seek administrative review of, or take legal action regarding, the State's failure make Seed payments.[5]

[¶33]  Equitable estoppel may be applied against governmental agencies.  *See Me. Sch. Admin. Dist. No. 15 v. Raynolds*, 413 A.2d 523, 533 (Me. 1980); *see also Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630; *City of Auburn v. Desgrosseilliers*, 578 A.2d 712, 714 (Me. 1990).  A party may not, however, estop a governmental agency from exercising its fundamental, sovereign powers.  *See, e.g., Fitzgerald v. City of Bangor*, 1999 ME 50, ¶ 13, 726 A.2d 1253.  In contrast to situations where a party seeks to prevent the government from exercising these inherent powers, in cases involving a

---

[5]  A plaintiff may invoke the doctrine of equitable estoppel.  *See Hanusek v. S. Me. Med. Ctr.*, 584 A.2d 634, 636 n.2 (Me. 1990).  There, we established that "[i]f sufficient facts setting out the elements of estoppel can be proven, estoppel should be available to bar a defendant from raising [an affirmative defense] in a civil action."  *Id.*

18

breach of contract, we have established that estoppel may be utilized. *See Town of Milo v. Milo Water Co.,* 131 Me. 372, 378, 163 A. 163 (1932). In *Milo*, we said,

> there seems to be a general consensus of opinion in the cases that when the State or a municipality makes itself party to a contract . . . it is, in matters relating thereto, subject to the same law of estoppel as other contracting persons who may be parties litigant . . . .

*Id.*; *see also Dolloff v. Gardiner*, 148 Me. 176, 184, 91 A.2d 320 (1952).

[¶34] To mount an equitable estoppel defense to prevent the State from asserting an affirmative defense, Murphy Homes was required to prove "that (1) the statements or conduct of the governmental official or agency induced [it] to act; (2) the reliance was detrimental; and (3) the reliance was reasonable." *Pelletier*, 2009 ME 11, ¶ 17, 964 A.2d 630.

A. Statements or Conduct of the Government

[¶35] First, the proponent of an equitable estoppel defense must show that the State actor made a misrepresentation, though there is no requirement that the misrepresentation be intentional or deliberate. *See Pino v. Maplewood Packing Co.,* 375 A.2d 534, 539 (Me. 1977). Here, there is no dispute that officials from two State agencies—DHHS and DOE—falsely represented to Murphy Homes officials that the Seed payments to which the school was

entitled were included in DOE tuition payments. These statements were routinely corroborated by documentation provided to Murphy Homes by both DHHS and DOE. During the relevant timeframe, Murphy Homes received from DHHS invoices that indicated that Murphy Homes's claims for medical services were "allowed" but that it was being paid an amount lower than the "allowed" amount, reinforcing the representations of the DHHS official who told Murphy Homes's CFO that although the Seed was not included in DHHS payments, it was being paid by DOE. Further, DOE routinely approved Murphy Homes for tuition payments that exceeded its operating budget, giving credence to the officials' assurances that the Seed payments that were excluded from DHHS remittance forms were included in the tuition rates set by DOE. Murphy Homes claims that because it relied upon these assurances from State officials and believed that the Seed payments were included in the tuition payments from DOE, it never sought administrative review of the payments it received from DHHS and did not seek legal redress until 2011. Therefore, based on the record, Murphy Homes has presented sufficient evidence to raise a dispute of material fact regarding the first element of equitable estoppel.

20

B.      Detrimental Reliance

[¶36]  Next, Murphy Homes was required to show that it relied on the words and actions of the State to its detriment, and did something it would not have otherwise done.  *See Desgrosseilliers*, 578 A.2d at 714.

[¶37]  Because, viewing the evidence in the light most favorable to it, Murphy Homes was falsely assured that the difference between the amount listed as "allowed" and the amount it was actually paid on the DHHS remittance forms was to be paid by DOE as a part of tuition payments, it never sought from DHHS a review of the reimbursements for the alleged underpayment.  Further, Murphy Homes was aware of and had previously invoked payment review procedures, a fact that serves as further proof that the State's conduct induced Murphy Homes to do something—forego invoking these procedures—that it would not have otherwise done.  In addition to dissuading Murphy Homes from utilizing the payment review process provided in the Manual, the State's conduct also prevented Murphy Homes from seeking legal redress until 2011, at which time some of its claims were barred by the statute of limitations.  Thus, based on the foregoing, Murphy Homes has also set forth sufficient evidence to raise a dispute of material fact as to the second element of equitable estoppel.

C.      Reasonableness of Murphy Homes's Reliance

[¶38]  Lastly, Murphy Homes was required to prove that its reliance on the State's conduct was reasonable.  *See Id.*  Reasonableness is a fact-intensive inquiry, and a court may conclude that Murphy Homes's reliance was unreasonable as a matter of law only when the evidence does not present any possible inferences of reasonable reliance.  *Cf. Levesque v. Chan*, 569 A.2d 600, 601 (Me. 1990).  For instance, in *Hanusek v. Southern Maine Medical Center* the plaintiffs, a husband and wife, attempted to invoke equitable estoppel to prevent the hospital from raising a statute of limitations affirmative defense to their malpractice claim stemming from allegedly negligent treatment the husband received at the hospital.  584 A.2d 634, 635-36 (Me. 1990).  Specifically, the plaintiffs alleged that they delayed consulting with an attorney and consequently filing suit because a nurse warned that if they sought legal redress, the husband's name would "be placed on a computer and all the doctors and hospitals in [the] area will know about him and no one will take him as a patient."  *Id.* at 637 (quotation marks omitted).  Relying on these statements, the plaintiffs refrained from taking action for over two years, and by the time they filed suit, the limitations period on their malpractice claim had run.  *Id.* at 636.

[¶39]   In a 4-3 decision, we held that the plaintiffs' reliance on the hospital employee's statement was unreasonable as a matter of law. *Id.* at 637.  In arriving at this conclusion, we noted that the plaintiffs failed to take any action related to their legal claims for almost three years in reliance on a single statement.  *Id.*  Further, the plaintiffs "made no attempt to confirm the validity of the nurse's statement with anyone from the hospital, such as an administrator or a physician."  *Id.*

[¶40]  Unlike the circumstances in *Hanusek*, where the plaintiff relied on a single statement made by a nurse of the defendant hospital, here Murphy Homes relied on what could be considered objectively trustworthy information from DHHS and DOE officials that was corroborated by a pattern of conduct occurring over the course of many years.  When Murphy Homes's CFO recognized a discrepancy in the payments the school was receiving from DHHS, he contacted DHHS directly to inquire about it.  After being informed by the DHHS official that DOE, and not DHHS, would be paying the Seed through tuition payments, the CFO contacted the very person responsible for calculating DOE tuition rates.  That DOE official corroborated the erroneous information the CFO received from the DHHS official.  Apart from the information Murphy Homes received from officials from both DHHS and DOE,

it also relied on information contained in documentation amassed over multiple years which confirmed Murphy Homes's understanding of the payment practices described by the State officials. Additionally, a DOE official testified in a deposition that she falsely certified on State-generated forms that providers such as Murphy Homes were receiving Seed payments for the purpose of obtaining the corresponding federal match funds.

[¶41] Furthermore, under this payment scheme, Murphy Homes would submit claims for reimbursement for medical services on a monthly basis, and consequently, each month DHHS would submit to Murphy Homes a remittance form indicating how much of Murphy Homes's claims it was "allowing." The monthly DHHS calculations usually involved hundreds or thousands of dollars, whereas the annual DOE tuition calculations involved amounts in excess of one million dollars. Thus, identifying discrepancies between the amount due as Seed payments from DHHS for medical services billed on a *monthly* basis, and the amount due as tuition set by DOE for educational costs on a *yearly* basis was not as "obvious" as the Court suggests. Even assuming, *arguendo*, that Murphy Homes realized at the earliest possible moment that Seed was not included in tuition, because DOE sets these rates on a yearly basis, Murphy Homes would have been foreclosed from meeting

DHHS' 120-day payment review deadline for a large portion of its claims. Affording Murphy Homes all favorable inferences here, I believe that it has set forth sufficient evidence to raise a disputed issue of material fact as to the third element of its estoppel defense as well.

[¶42]   Therefore, when viewing the evidence and all reasonable inferences derived therefrom in the light most favorable to Murphy Homes, a rational trier of fact could conclude that its reliance on the words and conduct of the State officials was reasonable.[6]  We should thus conclude that Murphy Homes has alleged sufficient facts to raise a disputed issue of material fact as to its equitable estoppel defense.  A jury, and not this Court, should determine whether Murphy Homes's reliance was reasonable.

[¶43]  For these reasons, I would vacate and remand for a trial on the merits.

---

[6]  Murphy Homes alleges in its complaint that it was led to believe for approximately a decade that Seed payments that were supposed to be made by DHHS were actually included in DOE tuition payments.  In concluding that Murphy Homes's equitable estoppel claim fails, the Court here unnecessarily takes an "all or nothing" approach.  The amount of time Murphy Homes "sat on its hands" before seeking legal redress is one factor among many that a fact-finder may consider in analyzing whether Murphy Homes's reliance was reasonable.  *See, e.g., Hanusek*, 584 A.2d at 637.  Consequently, a trier of fact could find that Murphy Homes's reliance on the statements of State officials regarding these payment practices was reasonable for some period of time, but not for the entire ten years it alleges to have been misled.  For instance, a fact-finder could determine that Murphy Homes's reliance was reasonable only during the first two years after the statements were made, a finding that would restrict Murphy Homes's recovery to only those damages it incurred during that timeframe.  The Court's decision forecloses that possibility by holding broadly that Murphy Homes's reliance on these statements essentially was unreasonable *for any specified amount of time*.

Gerald F. Petruccelli, Esq. (orally), and Kimberly A. Watson, Esq., Petruccelli, Martin & Haddow, LLP, Portland, for appellant John F. Murphy Homes, Inc.

Janet T. Mills, Attorney General, and Christopher C. Taub, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Business and Consumer Docket docket number CV-2013-47
FOR CLERK REFERENCE ONLY